KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
CHARLES N. FREIBERG (SBN 70890)
BRIAN P. BROSNAHAN (SBN 112894)
JACOB N. FOSTER (SBN 250785)
101 California Street, Suite 2300
San Francisco, California 94111
Telephone: (415) 421-6140
Facsimile: (415) 398-5030

LEVINE & MILLER
HARVEY R. LEVINE (SBN 61879)
CRAIG A. MILLER (SBN 116030)
LEVINE & MILLER
550 West C Street, Suite 1810
San Diego, CA 92101-8596
Telephone: (619) 231-9449
Facsimile: (619) 231-8638

Attorneys for Plaintiffs
JOYCE WALKER, KIM BRUCE HOWLETT,
and MURIEL SPOONER, on behalf of themselves
and all others similarly situated

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOYCE WALKER, KIM BRUCE HOWLETT, and MURIEL SPOONER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LIFE INSURANCE COMPANY OF THE SOUTHWEST, a Texas corporation,<br><br>Defendant. | **CLASS ACTION**<br><br>CASE NO.: CV 10-9198 JVS (RNBx)<br><br>Formerly Case No.: 3:10-cv-04852 JSW from Northern District of California<br><br>**DECLARATION OF JOYCE WALKER IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Judge James V. Selna<br><br>Date: September 10, 2012<br>Time: 1:30 p.m.<br>Courtroom: 10C |

I, JOYCE WALKER, declare:

1. I am one of the named plaintiffs in this action. I make this declaration in support of Plaintiffs' Motion for Class Certification in this matter. I have personal knowledge of the facts stated herein and, if called upon to do so, I could and would testify competently thereto.

2. I purchased a SecurePlus Provider life insurance policy ("Provider"), Policy No. LS0156670, from Life Insurance Company of the Southwest ("LSW") on or about December 27, 2007. My initial planned premium amount was $112,637 annually over a five-year period. I made the first premium payment of $112,000 in or around January 2008 and a second premium payment of $112,000 in or around February 2009.

3. In connection with my purchase of the Provider policy, I was presented with several policy illustrations. The illustration I relied on in deciding to purchase my policy was presented to me on or around October 3, 2007. I made my decision to purchase the Provider policy based on and after extensively reviewing the October 3, 2007 illustration. A true and correct copy of my October 3, 2007 illustration is attached hereto as Exhibit A, and a true and correct copy of my policy is attached hereto as Exhibit B.

4. I am not an insurance expert. At the time I purchased my policy, I was unfamiliar with insurance terminology, actuarial assumptions, and other technical insurance terms. I therefore trusted in LSW's expert and superior knowledge, as well as its long-standing experience, in accepting the representations of the illustration and purchasing the policy.

5. After I received and had begun to review the October 3, 2007 illustration to determine whether to purchase the policy, I attempted to conduct some independent research to help me better understand the illustration and the product I was considering because I wanted to be sure I was making the right decision with my retirement dollars. I did what I thought was a lot of investigation

and asked many questions. Nothing I learned made me aware of any of the nondisclosures or deceptive practices in the illustration that form the basis of my claims.

6. A significant reason I purchased the policy was that I understood that it was a safe and secure retirement investment for me, and that I could get retirement income through the policy's loan feature. The October 3, 2007 illustration showed Current Basis B values that were illustrated using an average interest rate based on 23 years of historical S&P 500 returns and on LSW's "current" rates and charges, which I understood followed the way the policy is supposed to work. I understood that earnings on the policy (above the 2% guaranteed annual minimum) were subject to the performance of the S&P 500 on average over time. I thus expected that if the S&P 500 performed the same on average as it had in the past, my policy would perform essentially as illustrated in the Current Basis B values and I could rely on the policy for retirement income. I also understood that if the S&P 500 performed a little better on average, I might earn a little more money, and that if the S&P 500 performed a little worse on average, I might earn a little less.

7. At the time I purchased my policy, I did not understand that there was an inherent risk of lapse in the policy due to the interaction of the volatility of the S&P 500 with the policy design, including the constant deduction of fees and the manner in which lapse is determined. I did not understand that the risk and performance of my policy could be significantly impacted by the volatility of the S&P 500 and the particular pattern of returns experienced, regardless of whether the S&P 500 performed the same on average as it had in the past. I now know that even if the S&P 500 performed the same on average as it had in the past, because of the volatility of the S&P 500 and its effect on the particular pattern of returns, I might not be able to rely on the policy to provide retirement income. In fact, because of the interaction between the pattern of returns in the S&P 500 and the

policy design, I now understand that there was a significant chance that my policy would lapse before I reach my life expectancy of 84 years and an even greater chance of lapse if I live longer than that. At no point did LSW disclose to me that because of the volatility of the S&P 500, I might not be able to rely on the policy for retirement income and my policy might lapse before I reach my life expectancy of 84 years, even if the S&P 500 performed the same on average as it had in the past.

8. If LSW had disclosed that my policy might lapse due to S&P 500 volatility even if the S&P 500 performed the same on average as it had in the past, I would not have purchased the policy.

9. I also bought the policy because I understood that I could get retirement income tax-free by taking policy loans. I understood that the policy was designed so that as a policyholder I could use policy loans to create years of tax-free retirement income to meet my retirement goals. This was confirmed for me by the October 3, 2007 illustration, which featured the use of the policy loan feature for annual income.

10. At the time I purchased my policy, I did not understand that due to the way the policy was structured, there was a significant risk of tax liability if I took advantage of the policy loan feature to provide retirement income. I did not understand that if I took advantage of the policy loan feature, I might have to pay taxes at ordinary income rates if my policy lapsed with a loan outstanding. I did not understand that there was a significant risk of lapse due to the policy design, including LSW's constant deduction of fees and its lapse-acceleration features whereby (1) "lapse" occurs not when the account value is zero, but when it is less than the surrender charge, and (2) LSW does not pay guaranteed interest and partial year equity earnings at the time that it deems a policy to "lapse" (so these sums do not count in determining whether a lapse has occurred and are forfeited to LSW), and (3) LSW imposes higher cost of insurance charges than are factored

into the illustration. I now understand that it was unlikely that I would be able to use the policy loan feature to earn the planned retirement income, that any income I received over the amount of premiums I had invested would be subject to taxes at ordinary income rates if my policy lapsed, and the only way to avoid having to pay these taxes would be to pay significant policy charges until I died that would increase as I aged. At no time did LSW disclose to me the policy's inherent risk of tax liability due to the high risk of policy lapse before my death.

11. If LSW had disclosed the inherent risk of tax liability described above, I would not have bought the policy. I also would not have purchased the policy if LSW had disclosed that the only way to keep my policy from lapsing and owing taxes at ordinary income rates would be to invest even more premium dollars into the policy and pay significant and ever-increasing charges to LSW for the rest of my life. I was not interested in something that I was going to have to continue to pay premiums into beyond those premiums listed in the October 3, 2007 illustration.

12. Another significant reason I bought the policy was that, based on representations in the October 3, 2007 illustration, I believed that I knew the precise amount of fees that LSW would charge me for the policy, which, although significant, appeared to be reasonable. The only fee shown in my illustration was a Monthly Administrative Charge and I therefore believed it was the only fee that would be taken out of my policy.[1] I now understand that in addition to the Monthly Administrative Charge of $1,072.17 disclosed in the October 3, 2007 illustration, my policy was subject to a number of additional and substantial costs that I was required to pay that were not identified in the illustration, including a premium expense charge of 5%, cost of insurance charges, and a monthly policy

---

[1] Although the illustration also mentions surrender charges and withdrawal fees, these are incurred at the option of the policyholder. I understood the Monthly Administrative Charge was the only fee that I would be required to pay.

DECLARATION OF JOYCE WALKER IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
Case No. CV 10-9198 JVS (RNBx)
4

fee of $5. I now know that in addition to deducting the $1,072.17 Monthly Administrative Charge every month, LSW also deducted from my initial premium payment $5,600 in premium expense charges, approximately $90-150 each month in cost of insurance charges, and a $5 policy fee every month in the first year. In addition, the October 3, 2007 illustration stated that the policy was subject to only "One Policy Fee," which I understood to mean that the policy was subject to only one fee. At the time of purchase, because the only fee shown in the illustration was a Monthly Administrative Charge, I thought there was only one policy fee, which was the monthly administrative charge, and which would constitute the only charge that would be deducted from my policy. Based on the October 3, 2007 illustration, I thus expected that the only policy fee that would be deducted from my policy consisted of a $1,072.17 monthly charge (about $13,000 per year) during the first ten years, with the monthly administrative charge then dropping to $429.29 for the duration of my policy. The illustration's depiction of only one fee was important to me because I expected that LSW would not charge me any fee other than that policy fee of $1,072.17 for the first ten years, and $429.29 thereafter. If LSW had disclosed in the October 3, 2007 illustration that in addition to the Monthly Administrative Charge, I would have to pay a 5% premium expense charge, cost of insurance charges, and a monthly policy fee of $5, I would not have purchased the policy.

13. I also now understand that LSW had no obligation to reduce my Monthly Administrative Charge from $1,072.17 to $429.29 in year 11 as shown in the illustration, and that LSW could continue charging me $1,072.17 for the duration of my policy. Nowhere in the October 3, 2007 illustration did LSW disclose that the reduction in the Monthly Administrative Charge in Policy Year 11, shown in the illustration, was not guaranteed. I would not have purchased the policy if LSW had disclosed in the illustration that the reduction in the Monthly Administrative Charge in year 11 was not guaranteed and that LSW could continue

1 charging me $1,072.17 for the rest of my life.

2   14. Another significant reason why I bought the Provider policy was 3 because I understood, based on representations in the October 3, 2007 illustration, 4 that the policy had a guaranteed minimum annual rate of return of 2% per year. 5 The illustration displayed "Guaranteed Values at 2.00%" by Policy Year. My 6 understanding of this language was that I would receive a guaranteed minimum 7 interest rate of 2% every year. That the policy had a guarantee in it of 2% every 8 year was an important feature to me because I understood that my investment 9 would gain value at a minimum of 2% every year, even in years where the S&P 10 500 gain was less than 2%.

11   15. I now understand that the minimum 2% "guarantee" is not an annual 12 rate of return but is in fact calculated as an average rate of return over five-year 13 intervals and upon policy termination by surrender or death. Nowhere in the 14 illustration did LSW disclose that the 2% guarantee would be applied only on an 15 average basis. I now understand that how LSW applies the 2% could have a 16 significant impact on how much money I actually would earn compared to how 17 much I thought I would earn at the time I purchased the policy. I also now 18 understand that my policy as illustrated on a guaranteed basis would lapse sooner 19 than illustrated because LSW does not credit policyholders with guaranteed 20 interest in determining whether their policy has lapsed. I also understand that 21 LSW imposes higher cost of insurance charges than are factored into the 22 illustration. If LSW had disclosed in the illustration that I would not be getting a 23 2% annual guaranteed rate of return and how the 2% minimum annual guarantee 24 really worked, I would not have purchased the policy.

25   16. When I acquired the Provider policy I understood that the non-26 guaranteed values in the October 3, 2007 illustration were illustrated based on 27 LSW's "current" rates and charges. I expected that rates and charges currently 28 being given to other policyholders would be given to me.

DECLARATION OF JOYCE WALKER IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
Case No. CV 10-9198 JVS (RNBx)
6

17. I now understand that the Current Basis A and Current Basis B values reflected in my October 3, 2007 illustration were not based on LSW's "current" rates and charges at the time my illustration was prepared. I now understand that the Current Basis A and Current Basis B values depicted in the illustration were significantly inflated by the inclusion of benefits (elimination of the Monthly Administrative Charge and inclusion of an Account Value Enhancement) that LSW claims it "anticipates" providing but has not actually given to any policyholder. At no time did LSW disclose to me that the Current Basis A and Current Basis B values were significantly inflated by the inclusion of the items described above.

18. If LSW had disclosed to me that the values and charges depicted as "current" in the illustration were not in fact current, and that the Current Basis B values on which I relied were significantly inflated by the inclusion of a value enhancement and fee reduction that had never been provided to any policyholder, I would not have bought the policy.

19. I did not discover the material facts constituting the basis of my claims before three years prior to the filing on September 24, 2010 of the Complaint in this case. In or around May 2009, I contacted two independent financial advisors and insurance experts, who each reviewed my policy and illustration, and through my contact with them I began to question the ability that my policy would perform as I had been led to believe through the October 3, 2007 illustration. As a result, I decided to cancel my policy and request a reimbursement from LSW of the $224,000 in premiums I had invested into the policy. On or about June 10, 2009, I sent a letter to LSW requesting a reimbursement of my premiums and explaining facts and certain claims of fraudulent and unfair conduct I understood at that time. On or about August 25, 2009, I received a letter from LSW denying my request for reimbursement of my premiums.

20.  In or around September 2009, I engaged Steve Burgess and his company, the Center for Life Insurance Disputes, to assist me in obtaining a reimbursement of my premiums from LSW and, if necessary, preparing a formal complaint to be filed with the California Department of Insurance. On or about October 30, 2009, Mr. Burgess filed on my behalf a formal complaint against LSW with the California Department of Insurance requesting a reimbursement of my premiums and setting forth certain claims of fraudulent and unfair conduct I understood at that time. Because I am not an insurance expert, I relied on Mr. Burgess in preparing the complaint and evaluating the facts and claims that should be included as the basis for my complaint and request for reimbursement. On or about April 22, 2010, I received a letter from the California Department of Insurance stating there was nothing it could do to help me.

21.  In or around May 2010, I formally surrendered my Provider policy. At the time I surrendered, LSW told me that my policy had an accumulated cash value of $197,647.21, which was subject to a surrender penalty of $55,013.42. I received a check from LSW in the amount of $142,633.79.

22.  I have actively participated in this case to date. Among other things, I have reviewed discovery requests and responses and assisted in finding documents requested by LSW and my counsel, reviewed drafts and final versions of various Court papers, prepared for and provided deposition testimony, and consulted with my counsel in person and on the phone on numerous occasions. I will appear and testify at the trial of this matter. I am prepared to continue to act as a class representative in this matter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of May, 2012 at San Diego, California.

*Joyce Walker*
Joyce Walker