1
2
3
4
5

Jonathan A. Shapiro (257199)
WILMER CUTLER PICKERING HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California  93304
Tel:    (650) 858-6101
Fax:    (650) 858-6100
jonathan.shapiro@wilmerhale.com

6
7
8
9
10
11
12

Andrea J. Robinson (pro hac vice)
Timothy J. Perla (pro hac vice)
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts  02109
Tel:    (617) 526-6000
Fax:    (617) 526-5000
andrea.robinson@wilmerhale.com
timothy.perla@wilmerhale.com

13
14

Attorneys for Defendant Life Insurance
Company of the Southwest

## UNITED STATES DISTRICT COURT

15

## CENTRAL DISTRICT OF CALIFORNIA

16
17

## SOUTHERN DIVISION

| | |
|---|---|
| JOYCE WALKER, KIM BRUCE HOWLETT, and MURIEL SPOONER, on behalf of themselves and all others similarly situated, | Case No.: CV 10-9198-JVS(RNBx) |
| Plaintiffs, | **DEFENDANT LIFE INSURANCE COMPANY OF THE SOUTHWEST'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| vs. | |
| LIFE INSURANCE COMPANY OF THE SOUTHWEST, a Texas corporation, and DOES 1-50 | Judge:       Hon. James V. Selna<br>Date:        September 10, 2012<br>Time:        1:30 PM<br>Courtroom:  10C |
| Defendant. | |

18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Introduction ...............................................................................................................1

Argument ...................................................................................................................3

I.  Plaintiffs Have Failed to Establish Predominance ....................................4

   A.  Fraudulent Prong of the UCL ...............................................................4

      1.  "Likely to Mislead" ......................................................................4

      2.  Plaintiffs' Duty to Disclose Theory Raises Even More Individualized Questions ........................................................20

      3.  Plaintiffs Cannot Assume that Everyone Was Injured ............21

   B.  Unlawful Prong of the UCL ................................................................22

   C.  Unfairness Prong of the UCL ..............................................................23

   D.  Fraudulent Concealment .....................................................................23

II.  Class Treatment is not Superior ...............................................................24

III.  Plaintiffs Have Failed to Satisfy Rule 23(a) ...........................................26

   A.  Commonality Requires Proof of "Common Answers" Lacking Here ........26

   B.  The Three Plaintiffs Are Not "Typical" At All ...................................26

   C.  Plaintiffs Are Not Adequate Class Representatives ............................28

IV.  Two of the Subclasses are not Ascertainable ..........................................29

Conclusion ..............................................................................................................30

*          *          *

Walker Timeline ........................................................................... Appendix A

Howlett and Spooner Timeline ..................................................... Appendix B

"Common" Questions Result in Uncommon Answers ............................ Appendix C

Illustration Variations are Endless ............................................... Appendix D

# TABLE OF AUTHORITIES

Federal Cases

*Badella v. Deniro Mktg. LLC*,
  2011 WL 5358400 (N.D. Cal. Nov. 4, 2011)....................................................25

*Bishop v. Saab Auto. A.B.*,
  1996 WL 33150020 (C.D. Cal. Feb. 16, 1996) ..................................................30

*Bradberry v. John Hancock Mut. Life Ins. Co.*,
  222 F.R.D. 568 (W.D. Tenn. 2004).............................................................. 16, 20

*Campion v. Old Republic Home Protection Co.*,
  272 F.R.D. 517 (S.D. Cal. 2011) ......................................................................5

*Cholakyan v. Mercedes-Benz, USA, LLC, -- F. Supp.*
  2d --, 2012 WL 1066755 (C.D. Cal. Mar. 28, 2012)........................................28

*Cohn v. Mass. Mut. Life Ins. Co.*,
  189 F.R.D. 209 (D. Conn. 1999) .......................................................................17

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*,
  2011 WL 6325877 (S.D. Cal. Dec. 16, 2011) ................................... 17, 19, 24, 26

*Cruz v. Dollar Tree Stores, Inc.*,
  2011 WL 2682967 (N.D. Cal. July 8, 2011) .......................................................4

*Daskalea v. Wash. Humane Soc.*,
  275 F.R.D. 346 (D.D.C. 2011) ...........................................................................3

*Elec. Databases Copyright Litig.*,
  654 F.3d 242 (2d Cir. 2011)..............................................................................29

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) .............................................................................3

*Fine v. ConAgra Foods, Inc.*,
  2010 WL 3632469 (C.D. Cal. Aug. 26, 2010) ....................................................5

*Gartin v. S & M NuTec LLC*,
  245 F.R.D. 429 (C.D. Cal. 2007).......................................................................24

*Gates v. Rohm & Haas Co.*,
  655 F.3d 255 (3d Cir. 2011) .............................................................................23

# TABLE OF AUTHORITIES

*Gonzalez v. Proctor and Gamble Co.,*
247 F.R.D. 616 (S.D. Cal. 2007) ........................................................................24

*Gray v. Toyota Motor Sales, U.S.A.,*
2012 WL 313703 (C.D. Cal. Jan. 23, 2012) ........................................................20

*Hanon v. Dataproducts Corp.,*
976 F.2d 497 (9th Cir. 1992) ....................................................................... 27, 28

*Hovsepian v. Apple, Inc.,*
2009 WL 5069144 (N.D. Cal. Dec. 17, 2009) ....................................................30

*Humana Military Healthcare Servs.,*
601 F.3d 1159 (11th Cir. 2010) .............................................................................3

*In re Conseco Life Ins. Co. Cost of Ins. Litigation,*
2005 WL 5678790 (C.D. Cal. 2005) ...................................................................24

*In re Google AdWords Litig.,*
2012 WL 28068 (N.D. Cal. Jan. 5, 2012) ...........................................................22

*In re Wal-Mart Stores, Inc. Wage & Hour Litig.,*
2008 WL 413749 (N.D. Cal. Feb. 13, 2008) .......................................................30

*In re Wells Fargo Home Mortg. Overtime Pay Litig.,*
571 F.3d 953 (9th Cir. 2009) ................................................................................4

*Keyes v. Guardian Life Ins. Co. of Am.,*
194 F.R.D. 253 (S.D. Miss. 2000) ............................................................... 17, 20

*Kingsbury v. U.S. Greenfiber, LLC,*
2011 WL 2619231 (C.D. Cal. May 23, 2011) .....................................................18

*Konik v. Time Warner Cable,*
2010 WL 8471923 (C.D. Cal. Nov. 24, 2010) ..................................................5, 6

*Markarian v. Conn. Mut. Life Ins. Co.,*
202 F.R.D. 60 (D. Mass. 2001) ................................................................... 17, 20

*Marlo v. United Parcel Serv., Inc.,*
639 F.3d 942 (9th Cir. 2011) ................................................................................3

# TABLE OF AUTHORITIES

*Martin v. Dahlberg, Inc.*,
   156 F.R.D. 207 (N.D. Cal., 1994) ..........................................................................24

*Matter of Rhone-Poulenc Rorer Inc.*,
   51 F.3d 1293 (7th Cir. 1995) ......................................................................... 25, 26

*Mazza v. American Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) .......................................................................... 4, 22

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999) ...............................................................................................29

*Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*,
   654 F.3d 618 (6th Cir. 2011) .................................................................................25

*Plascencia v. Lending 1st Mortgage*,
   259 F.R.D. 437 (N.D. Cal. 2009) ..........................................................................24

*Red v. Kraft Foods, Inc.*,
   2011 WL 4599833 (C.D. Cal. Sept. 29, 2011) ........................................................5

*Rodriguez v. Gates*,
   2002 WL 1162675 (C.D. Cal. May 30, 2002) .......................................................30

*Rodriguez v. Hayes*,
   591 F.3d 1105 (9th Cir. 2010) ...............................................................................29

*Sanchez v. Wal-Mart Stores, Inc.*,
   2009 WL 1514435 (E.D. Cal. May 28, 2009) .......................................................28

*Stearns v. TicketMaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011) .................................................................................4

*Stone v. Advance Am.*,
   278 F.R.D. 562 (S.D. Cal. 2011) ...........................................................................19

*Tidenberg v. Bidz.com*,
   2010 WL 135580 (C.D. Cal. Jan. 7, 2010) ............................................................30

*Tietsworth v. Sears, Roebuck & Co.*,
   2012 WL 1595112 (N.D. Cal. May 4, 2012) .........................................................29

# TABLE OF AUTHORITIES

*Tootle v. ARINC, Inc.*,
  222 F.R.D. 88 (D. Md. 2004) ...............................................................18

*Unionamerica Ins. Co. v. Fort Miller Group, Inc.*,
  2009 WL 688873 (N.D. Cal. Mar. 16, 2009) .......................................21

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ............................................................ 3, 19, 26

*Webb v. Carter's, Inc.*,
  272 F.R.D. 489 (C.D. Cal. 2011).........................................................22

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
  594 F.3d 1087 (9th Cir. 2010).............................................................17

*Zinser v. Accufix Research Institute, Inc.*,
  253 F.3d 1180 (9th Cir. 2001).............................................................25

<u>State Cases</u>

*Akkerman v. Mecta Corp.*,
  152 Cal. App. 4th 1094 (2007).............................................................20

*Berryman v. Merit Property Mngmt., Inc.*,
  152 Cal. App. 4th 1544 (2007).............................................................20

*Daugherty v. Am. Honda Motor Co.*,
  144 Cal. App. 4th 824 (2006).............................................................20

*Fairbanks v. Farmers New World Life Ins. Co.*,
  197 Cal. App. 4th 544 (2011) ................................................... passim

*Kaldenbach v. Mut. of Omaha Life Ins. Co.*,
  178 Cal. App. 4th 830 (2009) ................................................... passim

*Knapp v. AT&T Wireless Servs., Inc.*,
  195 Cal. App. 4th 932 (2011) ....................................................... 4, 5, 18

*Mass. Mut. Life Ins. Co. v. Superior Court*,
  97 Cal. App. 4th 1282 (2002).............................................................24

*Mirkin v. Wasserman*,
  5 Cal. 4th 1082 (1993).........................................................................24

LSW'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, 10-09198-JVS(RNBx)

# TABLE OF AUTHORITIES

*Pfizer v. Superior Ct.*,
   182 Cal. App. 4th 622 (2010) ................................................................5

<u>State Statutes</u>

Ins. Code § 10509.955 ................................................21

Ins. Code § 330 ........................................................21

Ins. Code. § 332 .......................................................21

# LEGEND

Exhibit to Declaration of Jonathan A. Shapiro ............................................"Ex. __"

Declaration of Timothy Perla Concerning Policy Sample ........ "Perla Sample Dec."

Declaration of Timothy Perla Concerning Production
   of Marketing Documents .................................."Perla Marketing Dec."

Declaration of Timothy Pfeifer ............................................."Pfeifer Dec."

Declaration of Les Logsdon ..............................................."Logsdon Dec."

Declaration of Matthew DeSantos ....................................... "DeSantos Dec."

Declaration of Stephanie Burmester ..................................."Burmester Dec."

Declaration of Elizabeth MacGowan........................................"MacGowan Dec."

Declaration of Vicki McDonald...................................."McDonald Dec."

Declaration of Sean L. Covi................................................."Covi Dec."

Declaration of Scott Foulk ................................................ "Foulk Dec."

Declaration of Mark L. Birnbaum ..................................."Birnbaum Dec."

Declaration of Marcus Norona......................................."Norona Dec."

Declaration of Jesse Obregon ..........................................."Obregon Dec."

# INTRODUCTION

This is a putative class action lawsuit challenging sales of indexed universal life insurance policies.  It is a disclosure case.  Plaintiffs, three former policyholders, argue that LSW provided them with pre-application illustrations that failed to disclose six particular pieces of information.  Plaintiffs now seek to certify a class under Rule 23(b)(3) consisting of all California holders of two kinds of LSW policies (Paragon and Provider).  By any measure, class certification should be denied.

The premise of Plaintiffs' Motion is that this Court can adjudicate LSW's liability to over 33,000 policyholders by focusing *exclusively* on the four corners of *some* illustrations provided to *some* policyholders.  However, the sale process is rich and varied, and cannot be adjudicated based on any single document.  As LSW will show through its submissions, thousands of state-licensed independent agents sell policies in one-on-one interactions with tens of thousands of policyholders.  These interactions are not scripted, mandated, or otherwise uniform, and, in order to understand or adjudicate any given sale, a jury needs to understand each particular interaction.

In the course of these interactions, the information that Plaintiffs label as "concealed" *was disclosed—repeatedly and in different ways*.  Some agents routinely shared all of the allegedly omitted information.  Some shared it orally, and some in writing.  Some shared some of it, tailoring disclosure to the idiosyncratic circumstances and priorities of their particular clients.  Some agents do not even use illustrations at all (even Plaintiffs acknowledge the lack of illustration use for 30% of the class).

Plaintiffs' own purchases underscore this varied reality.  Walker met with her insurance agent at least 6 times.  She received information about costs, taxes, guarantees, and other aspects of her policy, including specific information that she now labels "undisclosed."  Spooner and Howlett had their own idiosyncratic experience—a dozen meetings over 14 months including numerous disclosures—and the illustration that they

now challenge *did not even factor into their purchase decision.*  However, if Plaintiffs succeed here (*i.e.,* this Court certifies a class on the premise that only illustrations matter), such individualized facts—which exist for each of the over 33,000 policyholders — will never see the light of day.  That would not fairly adjudicate liability and would depart from precedent.  It would also violate due process.

Thus, common issues do not predominate under Rule 23(b)(3).  Plaintiffs' claims depend upon detailed factual investigation of every disclosure and circumstance involved in every sale to determine which putative class members learned what, when, how, and from whom.  Under the law of this Circuit — and sister Circuits — no class is certifiable.

Beyond a lack of predominance, other fatal problems with class certification exist:

• Superiority:  No jury could adjudicate all class claims given their individualized nature and LSW's 7th Amendment right to present individualized defenses.  Moreover, given the size of class claims, individual actions would be appropriate.

• Typicality:  Plaintiffs' own purchases highlight that every sale is unique, and their experiences in no way typify others'.  Moreover, Plaintiffs are subject to highly individualized causation and other defenses that will permeate trial.

• Adequacy:  Plaintiffs are not driving this train.  In fact, their claims are framed to reflect theories their lawyers developed *after* they surrendered their policies—and contrast sharply with what Plaintiffs said in their Department of Insurance complaints that pre-dated this case.  There is also is a real risk of conflicts between Plaintiffs' representations of the many sub-classes.

• Ascertainability:  Two of the proposed sub-classes cannot be ascertained without extensive factual investigation because membership depends on whether and when a policyholder received an illustration (or what information it contained); these matters are unknowable without testimony from each policyholder and agent.

LSW's voluminous submissions in connection with this motion amply demonstrate important differences in the sale process, and why they should not be set aside in the facile manner that Plaintiffs propose.  Appendices A and B to this Memorandum detail Plaintiffs' purchase timelines; Appendix C shows that Plaintiffs' supposedly "common" questions generate individualized inquiries; Appendix D shows some of the substantial

variation that exists even just within illustrations.  LSW has also filed: *(i)* Declarations of five insurance agents describing their varied sales practices, including disclosures of what Plaintiffs claim was concealed; *(ii)* an annotation of Plaintiffs' "Trial Plan" highlighting individual issues; *(iii)* Declarations of four LSW employees describing the sale process and other pertinent facts; *(iv)* Declarations of Timothy Pfeifer (actuarial expert) and Les Logsdon (life settlement broker) describing the flaws of Plaintiffs' expert's methodology; and *(v)* three Declarations of defense counsel supplying documents from discovery.

## ARGUMENT

Rule 23 is not "a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  Plaintiffs "must affirmatively demonstrate [their] compliance with the Rule" by "prov[ing] that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Id.*  Under Rule 23(b)(3), this includes demonstrating that "questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods of fairly and efficiently adjudicating the controversy."  *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011).[1]  The Court conducts a "rigorous analysis," which will often "entail some overlap with the merits of the . . . underlying claim."  *Dukes*, 131 S. Ct. at 2551.[2]

---

[1] The burden applies to *each* subclass, *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011).  That Plaintiffs propose a complicated subclass structure cuts against certification.  *Sacred Heart Health Sys. v. Humana Military Healthcare Servs.*, 601 F.3d 1159, 1176 (11th Cir. 2010) ("[c]ommon sense tells us that the necessity of a large number of subclasses may indicate that common questions do not predominate").

[2] A "rigorous" analysis is especially warranted given Plaintiffs' very significant access to discovery.  *See Daskalea v. Wash. Humane Soc.*, 275 F.R.D. 346, 356-57 (D.D.C. 2011).  Plaintiffs have received voluminous California materials, including:  all marketing materials; all policyholder complaint files; policyholder communications; and hundreds of thousands of pages of LSW email; and another million pages from third parties.

I.     **PLAINTIFFS HAVE FAILED TO ESTABLISH PREDOMINANCE**

A class under Rule 23(b)(3) may not be certified unless common issues "predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3); *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009).  Predominance has always been a high hurdle; the bar is even higher after *Dukes.  Cruz v. Dollar Tree Stores, Inc.*, 2011 WL 2682967, at *2 (N.D. Cal. July 8, 2011) (*Dukes* heightened predominance scrutiny).[3]

A.     **Fraudulent Prong of the UCL**

1.     **"Likely to Mislead"**

Predominance is lacking where, as here, putative class members received an individualized mix of oral and written information.  *Stearns v. TicketMaster Corp.,* 655 F.3d 1013, 1020 (9th Cir. 2011*)* (no predominance given "no cohesion among the members because they were exposed to quite disparate information from various representatives of the defendant"); *Mazza v. American Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012) ("relevant class must be defined in such a way as to include only members who were exposed to advertising that is alleged to be materially misleading" and must "exclude those members who learned [the] allegedly omitted [information] before they purchased").[4]

This is because, in order to adjudge whether something was likely to mislead a putative class member, a trier of fact must know *what information each received.  Knapp v. AT&T Wireless Servs., Inc.*, 195 Cal. App. 4th 932, 945 (2011) ("[w]hether the mere association of a certain number of minutes to a rate plan would so mislead proposed class members necessarily involves individualized inquiries" because of the varying

---

[3] The Complaint refers to a class under Rule 23(b)(2), but Plaintiffs have not pursued it.
[4] *Mazza* confines the "presumptions" of *Tobacco II* to cases of a "massive advertising campaign."  *Id.*  Here, as explained below, there is no such mass advertising.

1   representations and information each received).  If a policyholder received allegedly

2   omitted information, "there is absolutely no likelihood that they were deceived by the

3   alleged false or misleading statements."  *Pfizer v. Superior Ct.*, 182 Cal. App. 4th 622,

4   632 (2010); *Red v. Kraft Foods, Inc.*, 2011 WL 4599833, at *15 (C.D. Cal. Sept. 29,

5   2011) (proposed UCL class "grossly overbroad" where, as here, "members of the putative

6   class have seen all, some, or none of the advertisements that form the basis of a plaintiff's

7   suit"); *Konik v. Time Warner Cable*, 2010 WL 8471923, at *8 (C.D. Cal. Nov. 24, 2010)

8   ("notwithstanding . . . *Tobacco II*, class certification must be denied where Plaintiffs have

9   not shown that all class members were at least exposed to the misrepresentations").

10      Moreover, even assuming (falsely) that "common proof" about three Plaintiffs

11   could tell us what information 33,000+ others were *told* and otherwise *received*, other

12   individualized questions would proliferate, including: *(i)* what was actually read;[5] and *(ii)*

13   whether presented information was actually false as to each policyholder.[6]

14      Such individualized inquiries predominate here.  In tens of thousands of

15   transactions, thousands of independent agents made thousands of written and oral

16   disclosures to thousands of individual policyholders, many of which go to the heart of the

17   alleged omissions.  DeSantos Dec. ¶ 3-4.  Policyholders also bring their prior

18   experiences, knowledge, and sophistication, which bears on the nature of discussions

19

20

[5] *Knapp*, 195 Cal. App. 4th at 943-44 (whether UCL class members "did not read"
materials they received, and "discussed" alleged omission with agents, "constitutes facts
that would affect the determination whether a misrepresentation or omission had
occurred"); *Fine v. ConAgra Foods, Inc.*, 2010 WL 3632469, at *3 (C.D. Cal. Aug. 26,
2010) (denying UCL class certification, some class members "never read" statements).
[6] *Campion v. Old Republic Home Protection Co.*, 272 F.R.D. 517, 534 (S.D. Cal. 2011)
(under UCL, "individualized inquiry would be needed to determine whether the
statements . . . were actually misrepresentations"); *Konik*, 2010 WL 8471923, at *9 (no
certification absent evidence that "challenged statements were actually false as applied to
all (or even most) class members"); Burmester Dec. ¶ 4-18 (no class-wide falsity here).

with their agents.  *Id.*  At a minimum, gathering this information would require the parties "to interview the prospect, the agent, and any other individuals involved in the transaction, and review the documents generated or used in connection with that sales transaction."  *Kaldenbach v. Mut. of Omaha Life Ins. Co.*, 178 Cal. App. 4th 830, 840-41 (2009) (denying cert).

Even Plaintiffs' own expert recognizes the variation inherent in the sale process:

> [The sale of permanent life insurance is] a ***multi-faceted process***. . . . at the onset ***there are a variety of ways in which contact can be made and there are a variety of ways in which policy information can be transmitted to the potential client***.  That's the first step and it's a [] very broad set of characteristics that could be used to initiat[e] contact between a potential client and a potential insurance company.  And there may be ***contacts with multiple insurance companies and multiple agents simultaneously***.  After the individual has examined the data that they have gathered from either the insurance company or other outside sources, they then will analyze that data.  Sometimes with the ***assistance of an agent***[,] sometimes with the ***assistance of textbooks***[,] sometimes with the ***assistance of the Internet*** and do searches to try to determine is this product appropriate for me?

Ex. D 38:7-39:16 (emphasis added).  LSW's head of marketing put it more succinctly: "***sales are like snowflakes, insofar as each is different***."  DeSantos Dec. ¶ 8 (emphasis supplied).  Individualized questions include the following.

### a)  Did a Policyholder Receive an Illustration At All, And, if So, When and What Did it Say?

Plaintiffs would certify a class action that will adjudicate LSW's liability to 33,000+ people based solely on the content of one presumed form of illustration.  But not everyone even received an illustration, and we cannot determine who did.  Plaintiffs' own review of a sample of 400 policy files concluded that ***over 30% of policyholders did not receive a pre-sale illustration***.  Plaintiffs' inaccurate counting methodology deflated the

number,[7] but even 30% is fatal:  we cannot have "common" litigation based on allegedly

misleading illustrations if at least 3 of 10 putative class members did not receive them.[8]

This figure is not surprising.  LSW does not require illustration use prior to

application.  McDonald Dec. ¶ 13-14.  Rather, an illustration can be provided at any time,

and sometimes none is provided.  *Id*.[9]  For example, according to an agent who sold

*hundreds* of class period policies, the "vast majority of the time" (over 90%), "clients

decide to apply for the policy before they see any illustration."  Norona Dec. ¶ 16.  Other

agents do not provide illustrations.  *See* Covi Dec. ¶ 23 ("All of the information I provide

to my clients is conveyed orally or written down during our meeting on a notebook.").

Moreover, even as to the 70% of files that Plaintiffs estimate did contain

illustrations, individualized inquiry would determine whether/when those illustrations

were shared and if they had any sale impact.  For example, Howlett and Spooner decided

to "move forward" with purchasing LSW policies *four days before receiving the*

*illustration that they now challenge.*  Ex. K; Ex. C at 107:5-9; 120:9-121:2; 122:1-15.[10]

Even if one could confirm that a particular policyholder received and read an

---

[7] Because most files contain conflicting or incomplete information about illustration
receipt, Plaintiffs only reached 30% by making baseless assumptions to resolve all doubts
in favor of illustration receipt.  *See* Perla Sample Dec. ¶ 11-15.

[8] The parties stipulated a sample of 400 files was statistically significant, but that does not
mean the sample can tell us which of the 33,000+ policyholders received illustrations and
what they said.  In fact, the sample raises even more questions.  Nor does the stipulation
mean that the files are a one-stop source for documents provided to policyholders.

[9] LSW faces a class claim by two California Paragon policyholders (*i.e.*, putative class
members here) who *swear they did not receive illustrations before applying*, and are
arguing that LSW *discourages providing illustrations to any policyholders*.  *Maraldo v.*
*Life Ins. Co. of the S.W., et al.*, No. 11-cv-04972-YGR (N.D. Cal.), ECF No. 59 at 4.

[10] There is no common way short of a mini-trial of every policy sale to even determine
which policyholders received illustrations.  LSW's files would not do it.  McDonald Dec.
¶ 7.  According to one agent, "I often generate iterative illustrations on a computer and
discuss with policyholders, *but do not save them anywhere*."  Foulk Dec. ¶ 28.

illustration pre-sale, individualized inquiry would determine how it was explained and what information it contained.  Foulk Dec. ¶ 30 (without "being privy to the back and forth discussion that surrounds [illustrations] you would get an incomplete picture of the information I provided to my clients").  LSW does not have a policy requiring or encouraging agents to explain illustrations in any particular way.  Ex. F 256:2-257:23.  Agents describe illustrations in very divergent ways.  Covi Dec. ¶ 25-26; Foulk Dec. ¶ 29-32; Norona Dec. ¶ 18-20; Birnbaum Dec. ¶ 25-26.  Where policyholders did receive illustrations, content varied greatly.  Appendix D; MacGowan Dec. ¶ 4-6.  Agents are able to customize illustrations according to the particular customer's needs and wants:

- Whether to illustrate premium payments continuing indefinitely or ending (MacGowan Dec. ¶ 17-24);

- Whether to illustrate loans (*id.*);

- Whether to include the phrase "One Policy.  One Policy Fee.  One Premium.  One Company" (Ex. DD; MacGowan Dec. ¶ 35);

- Whether to illustrate using a constant S&P 500 return or to vary the illustrated non-guaranteed accumulated values and how to vary them (MacGowan Dec. ¶ 32);

- Whether to disclose the tax consequences of policy lapse with a loan outstanding (*e.g.,* "[p]olicy loans and withdrawals reduce the policy's death benefit and cash value and may result in a taxable event . . . substantial tax ramifications could result upon contract lapse or surrender") (Ex. BB; MacGowan Dec. ¶ 38);

- Whether to itemize policy costs (which are already disclosed in numerous other places).  Ex. CC; Foulk Dec. ¶ 38; MacGowan Dec. ¶ 40.

This all adds up to a world in which 33,000+ mini-trials would be necessary even to establish the basic premise of whether an illustration was in play in a particular sale,

how it was presented, and whether it contained information contradicting Plaintiffs' claims (*e.g.,* some illustrations specifically disclosed costs or tax risks).[11]

### b)   What Did the Agent Tell The Policyholder?

At bottom, each sale is a human interaction where an independent agent (usually affiliated with multiple insurers) provides information and a policyholder asks questions. Ex. G 92:14-20; Norona Dec. ¶ 4; Foulk Dec. ¶ 11-20; Birnbaum Dec. ¶ 7-11; Covi Dec. ¶ 4-12; Obregon Dec. ¶ 7-8.  LSW guides these agents only generally—*e.g.*, tell the truth, explain things that clients need to know, *etc.*—and provides information to use with consumers *at the agent's discretion*.  Ex. I 53:6-16.  Training is offered, but is not mandatory.  *Id*. 84:19-84:24; Covi Dec. ¶ 30; Birnbaum Dec. ¶ 32; Obregon Dec. ¶ 26-27.  Every training session differs greatly, depending upon the topic, audience, and instructor.  DeSantos Dec. ¶ 5.  LSW does not have any scripts for agents, and does not require that agents do or say anything in any given situation.  Ex. I 132:16-24; Obregon Dec. ¶ 27; Foulk Dec. ¶ 3; Birnbaum Dec. ¶ 2.

This result is a sale process that is—as it should be—tailored to the needs and wants of the particular customer at issue.  Policyholders apply for LSW policies for any number of reasons, including death benefit protection, the ability to defer premium payments, income replacement, burial costs, retirement planning, college saving, *etc*. JAS Dec. G 60:20-62:16; Birnbaum Dec. ¶ 13-16; Norona Dec. ¶ 7; Covi Dec. ¶ 13-16. The mix of information presented, questions answered, and reasons for the sale all depend upon particularized circumstances, varying from agent to agent and from

---

[11] Contradicting the Complaint, Plaintiffs now propose that their volatility and tax sub-claims do not depend entirely on illustrations.  Mot. at 13-14.  This makes no sense: Plaintiffs' assert that *illustrations* assumed constant S&P 500 to obscure risks associated with volatility and tax—no illustration, no claim.  In any event, if Plaintiffs now agree that information other than illustrations is relevant, that is fatal to class certification.

policyholder to policyholder.  Ex. G 24:4-25; 90:1-6; 156:15-22; 194:8-195:2; Ex. I 42:5-17; 120:22-121:6; Foulk Dec. ¶ 19; Birnbaum Dec. ¶ 13.  For example, depending on individual circumstances, some agents told members of the putative class:

- Only to base their decision on the guaranteed values of the contract, and to disregard non-guaranteed values (*see, e.g.*, Norona Dec. ¶ 20);

- That the S&P 500 was a volatile index, which was not reflected in any illustration they received and would likely cause their accumulated values to differ dramatically from what was illustrated (*see, e.g.*, Birnbaum Dec. ¶ 25);

- How guaranteed values are calculated on their Paragon or Provider policies, including that the guaranteed annual floor accumulation was 0% and that any additional guarantee was applied only retrospectively (*see, e.g.*, Covi Dec. ¶ 20);

- There are many costs associated with the Paragon and Provider policies, including cost of insurance charges, policy fees, accumulated value charges, and surrender charges, and in some cases, the amount of the costs (*see, e.g.*, Foulk Dec. ¶ 36-40);

- That they could incur income taxes on any outstanding policy loans if their life insurance policies lapse with loans outstanding (*see, e.g.*, Obregon Dec. ¶ 17);

- Paragon or Provider were new products, meaning that they had not been available for sale for more than ten years (*see, e.g.*, Birnbaum Dec. ¶ 22); and

- That any reduction to their monthly administrative charge and any account value enhancement were not guaranteed, and that they should not count on receiving either benefit.  *See, e.g.*, Foulk Dec. ¶ 46-49.

LSW has filed five agent Declarations further detailing the variety of agent interactions.

The named Plaintiffs also exemplify the centrality of agents to the sale process:

<u>Walker:</u>  Walker first considered purchasing insurance when she attended a presentation from Jeff Stemler and Michael Botkin.  They discussed market-based investments and made clear that "the sequence of returns matters."  Ex. GG.  Walker then met with them *on at least five occasions* to discuss purchasing a LSW policy.  Ex. A 34:21-35:8.  She asked "many questions about all the moving parts" of her policy (Ex. Q), including about how guaranteed values are calculated and the costs associated with her policy (all answered accurately).  Ex. V.  Her agent told her orally and in writing

about fees other than the Monthly Administrative Charge, including a fee of "Premium
— 5%." *Id*.; Ex. A 100:7-101:6.  Her agent also told her that the policy had an annual
"interest rate floor" of "0."  *Id;* Ex. HH (diagram showing no value growth when S&P
500 declines).  She asked other questions as well, about how to interpret her illustration,
about the likelihood of policy lapse, about tax treatment of policy loans, and about how
long her policy would stay in force on a guaranteed basis.  Ex. Z at LSW 2130-31.

    <u>Howlett & Spooner:</u>  Howlett and Spooner first met their agent (Jacob Cooper) at a
dinner seminar recommended by their friend.  Cooper "primarily using a white board and
erasable marker" described a variety of financial products (none of which was an LSW
policy).  Ex. B 19:12-15; 21:1-11; 66:3-10.  Howlett and Spooner engaged Cooper to
create a financial plan.  *Id*. 22:8-10.  He compiled information about their investments
and goals, creating a financial plan that included mutual funds and an oil and gas
partnership.  *Id*. 23:1-25:19.  After *a dozen meetings over 14 months*, Howlett and
Spooner purchased Paragon policies.  *Id.* 67:4-11.[12]  Cooper encouraged Howlett and
Spooner to conduct "due diligence", including reading a book called *Missed Fortune 101*,
which Spooner did.  Ex. L; Ex. C 11:16-13:24.  That book discloses that lapse of an IUL
policy causes a taxable event.  Ex. O at 3-6; *see also* Ex. E 246:5-13 (Plaintiffs'
representative stating that Missed Fortune sales approach is unique).

        c)    **What Documents or Presentations Were Involved?**

    Agents are free to (and do) make use of any documents or sales concepts
developed by LSW or to develop their own sales presentations.  Ex. I 120:22-121:6;
DeSantos Dec. ¶¶ 6-7; Foulk Dec. ¶ 3.  Other agents do not use any written sales

---

[12] Cooper also suggested an Indianapolis Life policy based upon a customized written
presentation.  Ex. Y at LSW1280-1329.  The presentation stated, "[l]oans are income tax
free as long as the policy is kept in force."  *Id*. at LSW 1308.

presentations at all.  Covi Dec. ¶ 24.  Agents are also free to (and do) make use of any of the thousands of marketing documents.  DeSantos Dec. ¶¶ 6-7.  Many develop their own marketing materials.  *Id.*  All of these materials add context—and, absent any testimony from each agent and policy owner, there is no way to know what any particular agent used in selling a particular LSW policy because LSW doesn't require that those materials be sent to LSW.  McDonald Dec. ¶ 7-8; Foulk Dec. ¶ 30.

Some of the written materials set forth the *precise* information that was allegedly omitted.  For example, agents provided written materials to policyholders including:

- Buyers' Guides describing how guaranteed values are calculated (including that the yearly floor on interest is 0%), the tax consequences of policy lapse, the existence of costs in the policy, etc. (Ex. EE; Ex. FF; Foulk Dec. ¶ 25);

- Policy forms, which specify how guaranteed values are calculated, how cash values accumulate (and thus, how they would interact with a volatile market), the costs associated with the policy, and any other details about how the policy functions (Obregon Dec. ¶ 15; Howlett Dec. Ex. B; Walker Dec. Ex. B);

- Marketing documents indicating that "[p]olicy loans and withdrawals will reduce the policy's cash value and death benefit and may result in a taxable event. Withdrawals up to the basis paid into the policy and policy loans thereafter would not create an immediate taxable event, but substantial tax ramifications could result upon policy lapse or surrender" (Perla Marketing Dec. ¶ 22-23);

- Documents that inform policyholders that "[t]here are administrative, cost of insurance and other charges associated with these IUL policies"  (Ex. BB at LSW 94157; Perla Marketing Dec. ¶ 11-12), and/or reports that specifically outline the amount of each of these costs (Ex. V; Foulk Dec. ¶ 36-39; Birnbaum Dec. ¶ 20);

- Other written disclosures (some not specific to LSW or its products), including emails, letters, literature, and notes during any of the many meetings that agents have with policyholders before applying for a policy that make the very disclosures Plaintiffs allege were misrepresented or omitted.  Ex. U; Obregon Dec. ¶ 16-19.

The Declaration of Timothy Perla Concerning Production of Marketing Materials describes some of the materials, highlighting some relevant contents.  Additionally, the named Plaintiffs exemplify the relevance of documents other than illustrations:

1    <u>Walker:</u>  A key basis for Walker's purchase decision was a unique document

2    created by her agents, which referred to "Equity-Indexed Life" (not any specific

3    company).  *See* Ex. Z at LSW 2172.  This document prompted Walker "to make the

4    initial payment" and was a "KEY document" in the alleged deception.  *Id.* at LSW 2131;

5    Ex. Q at JW 779.  Walker also comparison-shopped.  Before applying for her LSW

6    policy, she spoke to a different agents about a Pacific Life policy (Ex. A 96:6-97:1) and a

7    New York Life policy (*id.* 98:9-15).  Walker received illustrations from both companies,

8    which disclosed that policy loans are taxable upon lapse.  Ex. W (NY Life Illustration);

9    Ex. X (Pacific Life Illustration).  The New York Life agent also analyzed *the LSW*

10   *Provider policy* itself, and highlighted the costs and fees under the LSW policy.  Ex. U

11   (asking about "the additional factors (fees)" in the policy).  Ms. Walker forwarded this

12   email to her LSW agent, noting that they had "talked about that very issue" the previous

13   day.  *Id.*  She also conducted online research about indexed policies.  Ex. T; Ex. V.[13]

14   <u>Howlett & Spooner:</u>  Howlett and Spooner received and relied upon a "binder" of

15   documents that there is no basis to assume was ever provided to other putative class

16   members.  Ex. C 72:11-20.  The binder led to discussions, including about the effects of

17   "taking loans from the cash value of the policy," and their agent "explain[ed] the loan

18   feature."  Ex. B 94:9-95:13.  Their agents also answered "questions pertaining to . . . the

19   S&P average [and the] S&P 500 average rate of return."  *Id.* 211:13-16.  Their agents

20   used a "white board" to illustrate additional policy information.  Ex. C 106:11-107:4.

21   Howlett and Spooner did not even consider the illustration that they now challenge until

22

23

24   _____

25   [13] For example, one article stated "[i]f a policy terminates after a grace period, the
     repayment of any then-outstanding policy loan and unpaid loan interest will be treated as
26   a distribution and could be subject to tax to the extent the distribution exceeds your basis
     in the policy."  Ex. T at JW1980.

27

28

*after* they had decided to purchase.  *See supra.*[14]

### d)   **What Other Sources of Information Did the Policyholder Have?**

Policyholders have other sources of relevant information.  Some consult tax, legal, or financial experts.  Ex. A 98:12-99:6.  Some conduct extensive outside research about indexed universal life insurance policies.  *Id.* 99:7-100:24  Some comparison-shop and look at documents from other insurers.  *Id.* 96:6-97:1.  Some are replacing a prior life insurance policy, which they presumably purchased based on another set of disclosures.  Birnbaum Dec. ¶ 6.  Few (if any) of these documents end up in LSW's policy files.  McDonald Dec. ¶ 7.  In order to understand all the information that was conveyed to a policyholder, it would be necessary to interview (at a minimum) every policyholder and agent and review every document that passed between them.  Foulk Dec. ¶ 30.

### e)   **What Individualized Choices Did the Policyholder Make?**

The purchase decision itself presents policyholders with individualized choices.  *See* Burmester Dec. ¶¶ 8-19 (itemizing choices and explaining how they impact claims).  For instance, a policyholder can at the outset (and thereafter) control market volatility exposure:  *(i)* allocation of premiums (*i.e.,* some people opt for fixed interest rate untethered to the S&P 500); *(ii)* choice of death benefit (*i.e.,* "Option B" contracts are not subject to the volatility of which Plaintiffs' complain); and *(iii)* specified funding pattern (the manner and timing of funding greatly impacts the risk of policy lapse).  *Id.*  There are other choices too (*see id.*)—all of which are individualized, all of which impact

---

[14] Plaintiffs suggest that disclosures must be "clear and conspicuous," or contain an exact form of words to defeat their claims.  Mot. at 19.  However, given the varying locations, texts, sizes, contexts, and emphases, whether a specific disclosure is "clear and conspicuous" or conveyed relevant information in a given case is an individual question.

Plaintiffs' claims, and none of which can be addressed on a common basis.

Further, even after LSW issues a policy, policyholder behavior varies.  Some policyholders take loans, the vast majority do not.  Some policyholders make premium payments as illustrated, others (including all three Plaintiffs) do not.  Ex. R.  Most policyholders fare well because of the S&P 500-based cash value accumulation and the guarantee which prevents losses.  Burmester Dec. ¶ 4-6.

\* \* \*

In light of all of this variation, in virtually identical cases, courts have denied UCL class certification because individual inquiries about what was said—or omitted—to each customer predominate.  *Fairbanks v. Farmers New World Life Ins. Co.*, 197 Cal. App. 4th 544, 564 (2011) (no certification because "alleged misrepresentations of permanence were not commonly made," despite plaintiff's claim that uniform illustrations, marketing materials and policy *did* contain such representations); *Kaldenbach*, 178 Cal. App. 4th at 846 (no class certification despite argument that insurer "utilized uniform sales materials, training, and illustrations," because "individualized issues predominated" including "what materials, disclosures, representations, and explanations were given to any given purchaser").[15]  Courts applying similar statutes have reached the same conclusion:

> The allegations and evidence presented here so far show that individualized factual determinations clearly predominate over common questions because each class member's purchase of an insurance policy and EEP Rider was highly individualized.
>
> . . . [T]he declarations of Defendant's agents show that Defendant's sales of insurance policies use a non-uniform, non-standardized process.

---

[15] Plaintiffs are wrong in stating that *Fairbanks* and *Kaledenbach* involved challenged oral disclosures.  In each case (as here), the plaintiffs **tried** to cabin the analysis to purportedly uniform written disclosures, but, as here, "substantial evidence" showed that other disclosures mattered.  *Fairbanks*, 197 Cal. App. 4th at 553-554; *Kaldenbach*, 178 Cal. App. 4th at 842 (rejecting commonality "based solely on the use of illustrations").

Defendant's agents were not limited to selling only Defendant's policies, although they did receive training from Defendant when assigned to sell John Hancock policies.  Some clients resulted from "cold calls," while others came from referrals to agents.  Sales were made primarily through oral, "kitchen table" presentations, which were not scripted.  The agents attempted to determine particular facts about a potential client's personal situation, which certainly varies from person to person.  Sales involved numerous discussions or meetings with the potential client.  The marketing materials used by each agent varied, because, while Defendant did create and provide its own marketing materials, there was no requirement that all of those materials be provided to each customer.  Also, individual agents could create and use their own marketing materials, if submitted to Defendant for approval.  Finally, one can extrapolate from the [plaintiffs'] own use of background knowledge and external sources that other purchasers may also have consulted other sources.

Under these circumstances, ***it is impossible for the Court to consider issues of what representations were made or not made to each class member . . . without examining the individual circumstances of each person's transaction***.  As such, the individualized issues predominate over any common questions.

*Bradberry v. John Hancock Mut. Life Ins. Co.*, 222 F.R.D. 568, 572-73 (W.D. Tenn. 2004) (emphasis added); *Markarian v. Conn. Mut. Life Ins. Co.*, 202 F.R.D. 60, 69 (D. Mass. 2001) (no certification because "the total mix of information made available to each purchaser was distinctive, if not unique" because of varying written statements and illustrations, "oral representations," and "independent sources of advice"); *Cohn v. Mass. Mut. Life Ins. Co.*, 189 F.R.D. 209, 214-15 (D. Conn. 1999) (no certification because varied training, sales presentations, uses of illustrations, and discussions required "individualized fact-finding" into whether misrepresentation or omission occurred).[16]

---

[16] *Keyes v. Guardian Life Ins. Co. of Am.*, 194 F.R.D. 253, 256-57 (S.D. Miss. 2000) (rejecting "repeated incantations regarding Guardian's alleged use of 'uniform' illustrations" because "sales presentations differed from agent to agent, from client to client, and from transaction to transaction," requiring an "individualized inquiry as to the mix of information received by each class member").

Plaintiffs' attempts to distinguish this mountain of cases fail.  Plaintiffs assert that *reliance* is subject to common proof (Mot. at 16-20), but LSW is not arguing reliance. None of Plaintiffs' citations suggest that *the existence of a misrepresentation or omission* may be subject to common proof where different disclosures are made at different times to different policyholders.[17]  This means that Plaintiffs' attempts to distinguish *Fairbanks* and *Kaldenbach* fail.  Mot. at 17-19.  Both cases establish that individualized disclosures — *i.e.*, whether there was a lie or omission at all — defeat class certification.  *Fairbanks*, 197 Cal. App. 4th at 562 (denying UCL class certification, "individual evidence will be required to determine whether the representations at issue were actually made to each member of the class"); *Kaldenbach*, 178 Cal. App. 4th at 848.

At best, Plaintiffs' cited cases suggest a presumption of class-wide reliance *if*— unlike here—the disclosures or omissions are uniform.  *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 2011 WL 6325877, at *7 n.3 (S.D. Cal. Dec. 16, 2011) (distinguishing many of Plaintiffs' cited cases as confined to situations where policyholders made "uniform disclosures" to "all its customers"); *Kaldenbach*, 178 Cal. App. 4th at 850-51 (distinguishing *Tobacco II* and *Occidental Land* because they apply only where there is "evidence of uniform material misrepresentations having been actually made to [each] class member"); *Knapp*, 195 Cal. App. 4th at 946 (distinguishing *Occidental Land* as irrelevant "absent evidence of uniform material misrepresentations having been actually made to class members").  In any event, none of these cases allows a plaintiff to cherry-pick one document out of a sea of disclosure and pretend that only it matters.  *Compare Yokoyama*, 594 F.3d at 1090 (alleging that information was absent from *all* of Midland's "documentation" and plural "brochures"); *Kingsbury v. U.S.*

---

[17] This renders *Yokoyama* irrelevant, since that decision concerns only whether the court committed a "legal error" by applying a reliance element to the Hawaiian statute. *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1093 (9th Cir. 2010).

*Greenfiber, LLC*, 2011 WL 2619231, at *6 (C.D. Cal. May 23, 2011) (class members only received "one document" which was "a standard document").

Plaintiffs' bait-and-switch theory also does not support certification of a class: *(i)* as LSW's submissions demonstrate, myriad disclosures made at different times (often contemporaneously with, or prior to, illustration delivery) convened the supposedly concealed information; *(ii) more than 50% of the time*, policyholders never receive an illustration prior to policy receipt (*see* Perla Sample Dec. ¶ 6); and *(iii)* some people receive the policy without ever receiving an illustration.  Covi Dec. ¶ 23.

*Finally*, Plaintiffs cannot avoid the implications of a highly individualized sales process by declaring that only the illustrations they challenge matter.  The fallacy of that approach lies in the multitude of agent interactions and documents that permeate the sale process; in short:  "*A world where there's just the illustration doesn't exist.*"  Burmester Tr. 127:13-14.  That is because, as one agent put it, "my discussions with clients are far more important to presenting these products than any illustration."  Birnbaum Dec. ¶ 23. Thus, a trier of fact cannot determine whether someone received particular information without inquiry into every source of information provided.  *Compare* Mot. at 14 (claiming class can be certified because "no documents provided by LSW disclose" tax risks) *with Tootle v. ARINC, Inc.*, 222 F.R.D. 88, 96 (D. Md. 2004) (no commonality where, as here, court "would need to evaluate any oral representations . . . which could vary significantly among the class members-to determine if these representations are sufficient to overcome any alleged omissions in the written materials").  Indeed, *Fairbanks* rejected the same argument that Plaintiffs advance.  197 Cal. App. 4th at 564 (though "language in the policies themselves" is "amenable to common proof . . . it is still impossible to consider the language of the policies without considering the information conveyed by the Farmers agents in the process of selling them").

As important, LSW's key defense is that policyholders, through unique agent

interactions, received the allegedly omitted information.  LSW has a Due Process right to present relevant disclosures, even if they are individualized.  *See Dukes*, 131 S.Ct. at 2561 ("a class cannot be certified on the premise that [defendant] will not be entitled to litigate its statutory defenses to individual claims").  Just like in *Stone v. Advance Am.*, 278 F.R.D. 562, 570 (S.D. Cal. 2011), a class cannot be certified because Plaintiffs' UCL claims require a "fact intensive" exploration "of what was said . . . by each [class member] and [agent of the defendant], raising "due process concerns" about defendants' entitlement "to examine the individual customers."[18]

For these reasons, courts routinely reject attempts to ignore disclosures other than those around which plaintiffs try to pigeonhole their case.  *Countrywide*, 2011 WL 6325877, at *2 (*rejecting* plaintiff's "attempt to confine this case to the loan documents" because "these transactions involve more than just the exchange of written loan documents" and include "the exchange of numerous other written documents, and more importantly, oral discussions"); *Fairbanks*, 197 Cal. App. 4th at 559 (*rejecting* attempt to "consider the [purportedly uniform] language of the policies without considering the information conveyed by the Farmers agents in the process of selling them"); *Kaldenbach*, 178 Cal. App. 4th at 846 (*rejecting* plaintiff's assertion that case was based on "uniform sales materials, training, and illustrations" because "there was no evidence linking those common tools to what was actually said or demonstrated in any individual sales transaction"); *Markarian*, 202 F.R.D. at 66, 69 (*rejecting* attempt to "characteriz[e] the central issue as the omission of this information from the Illustrations," because "the policy illustration was not a stand-alone document, but rather was only one piece of the

---

[18] Due Process requires that LSW "must be afforded the opportunity to explore and introduce evidence, with respect to each class member's claim, including . . . the types of alleged representations or warnings the class member heard or read."  *Sanchez v. Wal-Mart Stores, Inc.*, 2009 WL 1514435, at *4 (E.D. Cal. May 28, 2009).

entire mix of information made available to each prospective policyholder").[19]

### 2. Plaintiffs' Duty to Disclose Theory Raises Even More Individualized Questions

Individual inquiries also predominate over whether LSW had a duty to disclose the allegedly omitted information to each policyholder.  *See Gray v. Toyota Motor Sales, U.S.A.*, 2012 WL 313703, at *3 (C.D. Cal. Jan. 23, 2012) (UCL claim must include a duty to disclose "because a failure to disclose a fact one has no affirmative duty to disclose is not 'likely to deceive' anyone within the meaning of the UCL").[20]  In *other* cases, a duty to disclose may be common (*e.g.*, a statute mandates disclosure of specific information).  But not here—no statute requires specific disclosure of the matters about which Plaintiffs complain.  Instead, Plaintiffs' stated bases for a "duty to disclose" are highly contextual.  *Akkerman v. Mecta Corp.*, 152 Cal. App. 4th 1094, 1103 (2007) (under UCL, where "extent" of a "duty [to disclose] will necessarily vary from case to case, individual issues will predominate over common ones").

*First*, Plaintiffs' statutory duty-to-disclose claims (Mot. at 25) presuppose a requirement that LSW provide facts "which are or which [LSW] believes to be material to the contract."  Ins. Code. § 332.  What information is "material" to any given sale is individualized, as people purchase policies for different reasons.  *Unionamerica Ins. Co. v. Fort Miller Group, Inc.*, 2009 WL 688873, at *5 (N.D. Cal. Mar. 16, 2009) (§§ 330-332 apply "a subjective standard to the test for materiality" because "the critical question

---

[19] *See also Bradberry*, 222 F.R.D. at 573 (*rejecting* attempt to "focus solely on the advertising materials . . . in an attempt to circumvent the necessarily individualized nature of the non-scripted, oral presentations"); *Keyes*, 194 F.R.D. at 257 (no predominance despite "uniform illustrations," because "sales presentations differed from agent to agent, from client to client, and from transaction to transaction").

[20] *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 838 (2006) (same); *Berryman v. Merit Property Mngmt., Inc.*, 152 Cal. App. 4th 1544, 1557 (2007) (same).

is the effect truthful answers would have had on the particular [party], not on some 'average reasonable' [party]"); *Fairbanks*, 197 Cal. App. 4th at 565 (individualized issues predominated because "policyholders may have purchased their insurance for any of [many] reasons").  To a policyholder who has no interest in loans, tax consequences of loans are not material.[21]  *See* Birnbaum Dec. ¶ 15 (a "large subset of my clientele is neither particularly interested in (nor has any particular need for) Provider for cash value accumulation (which is why that is not the primary focus of my discussions with them)").

*Second*, Plaintiffs assert a duty to disclose based on purported "misleading partial disclosures."  Mot. at 25.  But that just begs the question:  which "partial disclosures" were made to which of the 33,000+ policyholders?  The individualized answer to that question necessarily determines the existence and scope of any such duty.

*Third*, to the extent that a duty to disclose is based on LSW's "superior knowledge of material facts" (Mot. at 25), that requires an inquiry into each buyer's sophistication (which varies greatly).  Foulk Dec. ¶ 16-19; Obregon Dec. ¶ 5.  The disclosure duty to a policyholder who works in the finance industry and is well familiar with market volatility differs from the disclosure duty to someone who has never before purchased insurance.

### 3.   Plaintiffs Cannot Assume that Everyone Was Injured

Plaintiffs must demonstrate that every putative class member suffered *some* injury. *Mazza*, 666 F.3d at 594 ("[n]o class may be certified that contains members lacking Article III standing").  Moreover, although variation in "the amount of damages" is not fatal, *Yokoyama*, 594 F.3d at 1094, Plaintiffs must "affirmatively demonstrate[] that restitution can be calculated by methods of common proof."  *In re Google AdWords*

---

[21] The other two statutes Plaintiffs cite merely call for disclosure of that which LSW "ought to communicate" (Ins. Code § 330), or prohibit "misleading" illustrations (Ins. Code § 10509.955), but do not establish the *scope* of that duty.

*Litig.*, 2012 WL 28068, at *15 (N.D. Cal. Jan. 5, 2012).[22]  They have not.

Plaintiffs offer an analysis by Dr. Brockett as their sole support for the proposition that injury is subject to common proof.  However, as explained by Timothy Pfeifer (unlike Dr. Brockett, a credentialed actuary competent to address matters concerning illustrations), calculating damage requires extensive information particular to each policyholder.  Dr. Brockett's analysis is fatally flawed because it considers only illustrations, ignoring *everything* else.[23]  *See* Pfeifer Dec.

Finally, although Brockett claims that his damages method is "common," he does not contend that it is a "fair measure of damages."  *See* Shapiro Dec. Ex. D 269:17-270:12 (testifying that he "came up with" damages for Walker but, disclaiming "any opinion whatsoever as to whether it's fair or not").  A damage methodology is not an appropriate basis to award damages for 33,000+ policyholders if even the proponent of the method cannot say if generates a "fair" result.  *See* Rule 23(b) (class must be "fair and just");  *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 266-74 (3d Cir. 2011) (certification must be fair, cannot be based on a "model" that "assumes away" differences).

B.     **Unlawful Prong of the UCL**

Plaintiffs' allegations under the UCL "unlawful" prong are all grounded in the same allegations of "LSW's misrepresentations and omissions."  Mot. at 20.  Therefore,

---

[22] To the extent *Tobacco II* held that UCL plaintiffs need not prove injury to absent class members in a *state* proceeding, it is irrelevant in this *federal* case.  *Webb v. Carter's, Inc.*, 272 F.R.D. 489, 498 (C.D. Cal. 2011) (*Tobacco II* "did not, and could not, hold that uninjured parties could be class members in a class action brought in *federal* court, despite their lack of Article III standing") (emphasis in original).

[23] For instance, in purporting to construct a formula to compute the decreased "actual value" of policies, Dr. Brockett did not consider the multi-billion dollar secondary market that individually prices policies based on unique circumstances of the insured and policy structure.  The existence of that market further undermines Dr. Brockett's approach to calculating damages.  *See* Logsdon Dec.

individual issues predominate for the same reasons set forth above.  *Campion*, 272 F.R.D. at 533 n.3 (denying certification because unlawful prong claim predicated on alleged omissions "faces the same impediments to class certification as the UCL fraud claim").

### C.     Unfairness Prong of the UCL

Plaintiffs' allegations under the "unfair" prong of the UCL are all grounded in the same misrepresentation and omission allegations, and therefore, individual issues predominate for the same reasons as set forth above.  Moreover, the amorphous balancing test Plaintiffs propose is necessarily individualized:  whether each class members' loss of money is outweighed by the benefits LSW conferred upon that class member necessitates inquiries into the facts and circumstances of each purchase and class member:

> [Defendant's] policies were sold by independent agents, and during the class period, they were not required to attend training or utilize any given sales materials.  Agents were not required to adhere to a scripted sales presentation.  Indeed, [the agent], who sold [plaintiff] his policy, testified at his deposition that he did not use a scripted sales presentation or any training materials in making the sale to [plaintiff]….  Thus, . . . the determination of what business practices were allegedly unfair turns on individual issues.

*Kaldenbach*, 178 Cal. App. 4th at 850.

### D.     Fraudulent Concealment

Plaintiffs also seek to certify fraudulent concealment classes.  However, individual issues predominate for all the same reasons set forth above.  Additionally, these claims require proof that each putative class member *justifiably and actually relied* upon the alleged misrepresentations or omissions.  This is an insurmountable obstacle to certification.  *In re Conseco Life Ins. Co. Cost of Ins. Litigation*, 2005 WL 5678790, at *3 (C.D. Cal. 2005); *Gartin v. S & M NuTec LLC*, 245 F.R.D. 429, 438 (C.D. Cal. 2007); *Gonzalez v. Proctor and Gamble Co*.,  247 F.R.D. 616, 623 (S.D. Cal. 2007); *Martin v. Dahlberg, Inc*., 156 F.R.D. 207, 217 (N.D. Cal., 1994).

Plaintiffs cannot evade this rule by invoking a "presumption" of reliance on material representations. Mot. at 26. *First*, any such presumption does not apply where, as here, the information provided to each policyholder differed. *Mazza*, 666 F.R.D. at 596 ("[a] presumption of reliance does not arise when class members were exposed to quite disparate information from various representatives of the defendant"); *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1094 (1993) (presumption of reliance in *Occidental Land* and *Vasquez* only applies where "identical representations" made); *Kaldenbach*, 178 Cal. App. 4th at 851 (distinguishing *Occidental Land* and *Vasquez*, inference "does not come into play absent evidence of uniform material misrepresentations having been actually made to [each] class member"). *Second*, LSW is entitled to rebut this presumption, and to do so on an individual basis. *Plascencia v. Lending 1st Mortgage*, 259 F.R.D. 437, 447 (N.D. Cal. 2009). Class certification would deprive LSW of this right.

Finally, materiality is itself individualized where (as here) there is evidence that each class member is "differently situated" and purchased policies for "varied" reasons. *Countrywide*, 2011 WL 6325877, at *10; *Mass. Mut. Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1294 n.5 (2002) (no certification if "class members were provided such a variety of information that a single determination as to materiality is not possible"); *Badella v. Deniro Mktg. LLC*, 2011 WL 5358400, at *9 (N.D. Cal. Nov. 4, 2011) (individual materiality inquiries predominate given evidence that people purchase goods "for many different reasons and for many different purposes").

## II.   CLASS TREATMENT IS NOT SUPERIOR

In assessing whether a class action is superior under Rule 23(b)(3), courts consider the size of individual claims and "the likely difficulties in managing a class action" *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1191-92 (9th Cir. 2001).

Here, class claims are not small, and "individual claims might economically and reasonably be pursued individually or permissively joined." *Zinser*, 253 F.3d at 1191

n.7; *see also Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 632 (6th Cir. 2011) (low six-figures damages "do not support a finding of superiority" because they do not "preclude individual class members from seeking relief through litigation").  For example, Dr. Brockett asserts ████████ worth of damages to Ms. Walker on just one of her six claims.  *See* Brockett Dec. at 69-71.

Moreover, "the complexities of class action treatment outweigh the benefits of considering common issues" in an action involving 33,000+ policyholders making individual purchasing decisions, especially given the sheer amount of evidence needed to determine which representations were made to each.  *Zinser*, 253 F.3d at 1192 ("[i]f each class member has to litigate numerous and substantial issues to establish his or her right to recover individually, a class action is not superior").  LSW could not feasibly exercise its right to discover and present disclosures made to putative class members before one jury.  *Matter of Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995) (Seventh Amendment requires that all overlapping liability issues be determined by one jury).

Plaintiffs cannot paper-over these problems with a "Trial Plan" that ignores the difficulties involved.  Plaintiffs cannot prove class liability without accounting for *all* disclosures made to all class members—and those varied disclosures would be the heart of LSW's defense to each individual claim.  An annotation of Plaintiffs' "Trial Plan" is attached to the Declaration of Jonathan Shapiro.[24]

## III.   PLAINTIFFS HAVE FAILED TO SATISFY RULE 23(a)

### A.   Commonality Requires Proof of "Common Answers" Lacking Here

Plaintiffs assert that commonality "plainly exists" based on a laundry list of

---

[24] Plaintiffs' six overlapping subclasses only exacerbate the manageability problem.  *See Haley v. Medtronic, Inc.*, 169 643, 656 (C.D. Cal. 1996) (an approach "whereby subclasses of plaintiffs are created and only certain elements of some causes of actions are heard, seems inherently complicated and incredibly inefficient").

"common" questions. *See id.* 9-11. The Supreme Court rejected this approach in *Dukes*. Plaintiffs cannot simply list "common questions — even in droves" because "any competently crafted class complaint literally raises common questions." *Dukes*, 131 S.Ct. at 2551. Instead, they must demonstrate "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.*

Here, Plaintiffs' purportedly common questions cannot "generate common answers." *Id.*; Appendix C. Independent agents have discretion regarding disclosure. Shapiro Dec. Ex. I 87:20-88:2 (information disclosed in "different ways . . . depend[ing] on the sale"); Ex. G 84:13-22 (what an agent discloses "depends on whether the client was interested in learning about some of those things."). A "policy of *allowing discretion* . . . is just the opposite of a uniform . . . practice that would provide the commonality needed for a class action; it is a policy *against having* uniform . . . practices." *Dukes*, 131 S.Ct. at 2554. For example, Plaintiffs identify a "common" question whether LSW "failed to disclose" certain information. *See* Mot. 9-10. But any answer must inquire into what was disclosed, in what form, and when. *Countrywide*, 2011 WL 6325877, at *7 (despite allegations of "standardized loan documents that all failed to disclose the same material information," varying sale processes and disclosures defeated commonality).

### B. The Three Plaintiffs Are Not "Typical" At All

Typicality asks "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992). Moreover, "if there is a danger" that a named plaintiff will be "preoccupied with defenses unique to it," class certification is inappropriate. *Id.* at 508; *Ellis*, 657 F.3d at 984.

Far from "typical," these Plaintiffs embody sale variability. As further highlighted in Appendices A and B, Plaintiffs each had months of meetings with independent agents.

They received dozens of unique documents.  *Id.*   These interactions are highly relevant "conduct . . . unique to the named plaintiffs."  *Hanon*, 976 F.2d at 508.  Indeed, discovery has already uncovered that they each received much of the allegedly omitted information:

- <u>Walker:</u> received information about taxation upon policy lapse (Ex. W; Ex. X), the amounts of policy costs (Ex. V), the absence of a guaranteed annual 2% floor (*id.*), and the fact that the sequence of volatile returns would affect her ultimate value (Ex. GG).

- <u>Howlett and Spooner:</u>  received information concerning taxation upon policy lapse (Ex. O; Ex. Y at LSW 1308) and the cost of insurance and premium expense charges associated with their policies (*Id.* at LSW 1302).

Moreover, Plaintiffs' trials will turn on individualized defenses.  LSW intends to prove that Plaintiffs have buyers' remorse because they experienced adverse life events (e.g., houses lost value or stock market losses (Ex. P; Ex. M; Ex. N), that they did not care about the allegedly omitted information, and that they seek any "loophole" (Ms. Walker's word) to obtain premium refund.  Ex. S.  Trial evidence will include:

- Spooner and Howlett decided to purchase *before* they saw an LSW illustration.  Ex. K.  Ms. Walker relied on "KEY" documents other than an illustration.  Ex. Q.[25]

- All Plaintiffs submitted pre-litigation complaints that had nothing to do their current allegations.  Ex. Y; Ex. Z.

- Walker ████████████████████████████████ is unfit to sue on behalf of 30,000+ others who supposedly might ████████████.  Ex. A 187:21-22.

- Spooner and Howlett's cases will turn on their lie to LSW.  They took a mortgage on their house in order to fund life insurance (a risky strategy called "premium financing").  Ex. C.  LSW's application asks about the source of funding.  Ex. J.  An indication of premium financing causes LSW to warn of associated risks.  Howlett and Spooner lied to LSW about their source of funding.  *Id.*, *see also* Ex. II.  Any risk they took is their fault.

---

[25] Further, Walker certified that she did not receive a pre-sale illustration (Ex. AA), and Howlett and Spooner received replacement illustrations that they never read (Ex. Y at LSW 1331-1356).  None paid all illustrated premium amounts.  Ex. R; Ex. C 225:23-25.

*See Hanon*, 976 F.2d at 508; *Cholakyan v. Mercedes-Benz, USA, LLC*, -- F. Supp. 2d --, 2012 WL 1066755, at *16 (C.D. Cal. Mar. 28, 2012) (denying certification because "even an arguable defense peculiar to the named plaintiff" destroys typicality).

### C.   Plaintiffs Are Not Adequate Class Representatives

These Plaintiffs are unfit class representatives. *Sanchez*, 2009 WL 1514435, at *3 (plaintiffs must "understand[] and control[] the major decisions of the case"). They do not understand basic facts of the case or control major decisions. Ex. A 150:8-17 (Plaintiff did not "have any knowingness" of the Court, including judge's name and gender, or Court location). Spooner is "unsure" whether she is a member of subclasses (Ex. C 248:12-16) and doesn't know whether she is "responsible for making sure that the class… is treated fairly." *Id*. 250:21-251:10. When asked what she was doing to "make sure that this lawsuit doesn't end up with the lawyers making more money than the [class]," Ms. Spooner disclaimed, "I don't believe there's any anything I can do at this point in time." *Id*. 255:20-256:3. Lead Plaintiffs only had a "very brief meeting" two years ago. Ex. B 140:16-141:17. Spooner did not do any diligence before hiring class counsel. Ex. C 252:13-24; 254:2-5.[26]

Further, Plaintiffs cannot fairly represent the six subclasses. *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010) (requiring "absence of antagonism . . . between representatives and absentees"). When Plaintiffs choose which subclasses to emphasize, some class members will suffer. The Second Circuit rejected certification where, as here, "the named plaintiffs, [held] combinations of … three categories of claims" and, were likely to favor "more lucrative … claims" in any settlement. *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 250-53 (2d Cir. 2011) ("when categories

---

[26] Plaintiffs also have not retained documents. Howlett apparently discarded handwritten notes of his meetings with his agents. Ex. B 153:14-18. Walker did not believe she was under any obligation to retain certain documents. Ex. A 94:20-95:4.

of claims have different settlement values . . . how can the value of any subgroup of claims be properly assessed without independent counsel pressing its most compelling case?"); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855 (1999) ("even ostensible parity . . . would be insufficient to overcome the failure to provide the structural protection of independent representation as for subclasses with conflicting interests").[27]

## IV.   TWO OF THE SUBCLASSES ARE NOT ASCERTAINABLE

"As a threshold matter, and apart from the explicit requirements of Rule 23(a), the party seeking class certification must demonstrate that an identifiable and ascertainable class exists." *Tietsworth v. Sears, Roebuck & Co.*, 2012 WL 1595112, at *13 (N.D. Cal. May 4, 2012). A class definition must be "precise, objective, and presently ascertainable." *Rodriguez v. Gates*, 2002 WL 1162675 at *8-9 (C.D. Cal. May 30, 2002) (must be "administratively feasible for the court to ascertain whether an individual is a member" through the use of "objective criteria"). The court must be able to determine class members *without* having to answer numerous fact-intensive questions. *Tidenberg v. Bidz.com*, 2010 WL 135580 (C.D. Cal. Jan. 7, 2010) (class definition "must not require the court to make a determination of the merits of the individual claims").[28] Even if a class definition is facially objective, it must not include non-injured individuals. *Hovsepian v. Apple, Inc.*, 2009 WL 5069144, at *6 (N.D. Cal. Dec. 17, 2009).[29]

Plaintiffs' "General Sales Illustration" subclasses depend on identifying individuals who received an illustration prior to application. There is no way of doing so, short of a mini-trial on each individual sale to determine if and when the policyholder

---

[27] Dr. Brockett values the "Undisclosed Fees" and "General Illustration" sub-classes substantially higher than the "volatility" and "tax" sub-classes. *Compare* Brockett Dec. at 57-61 *with id.* at 62-71 (claim value as much as three times greater for Ms. Walker).
[28] *See also In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, 2008 WL 413749 at *5 (N.D. Cal. Feb. 13, 2008)
[29] *Bishop v. Saab Auto. A.B.*, 1996 WL 33150020, at *5 (C.D. Cal. Feb. 16, 1996).

received an illustration — LSW's policy files are not a complete record of documents given to policyholders, and many policy files offer conflicting evidence of whether an illustration was used.[30]  Plaintiffs propose no other solution to this problem.[31]

Plaintiffs' "Undisclosed Fees" subclass also depends upon differences in the *content* of illustrations (people who received certain illustration pages are not class members).  This would require collection of every document provided to every policyholder (most of which is not in LSW files), and testimony, to determine whether the policyholder received the allegedly "undisclosed" information.  For example, absent individual investigation, it would be impossible to know whether a policyholder received a cost report that does not appear in his or her policy file (because an agent printed one up, showed it to a customer, but never submitted it to LSW).  Foulk Dec. ¶ 38.

## CONCLUSION

The Court should deny class certification.


__/s/ Jonathan A. Shapiro_____
Jonathan A. Shapiro

---

[30] *See* McDonald Dec. ¶ 7; Perla Sample Dec. ¶ 10-15.
[31] Ms. Dinglasian's Declaration only estimates the *number* of policies in the subclasses, not which *particular individuals* would be members.