**EXHIBIT 1: [PROPOSED] SUBSTITUTED SUPPLEMENTAL MEMORANDUM**

JONATHAN A. SHAPIRO (257199)
WILMER CUTLER PICKERING HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Tel:   (650) 858-6101
Fax:   (650) 858-6100
jonathan.shapiro@wilmerhale.com

ANDREA J. ROBINSON (PRO HAC VICE)
TIMOTHY J. PERLA (PRO HAC VICE)
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel:   (617) 526-6000
Fax:   (617) 526-5000
andrea.robinson@wilmerhale.com
timothy.perla@wilmerhale.com

Attorneys for Defendant Life Insurance
Company of the Southwest

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOYCE WALKER, KIM BRUCE HOWLETT, and MURIEL SPOONER, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> LIFE INSURANCE COMPANY OF THE SOUTHWEST, a Texas corporation, <br><br> Defendant. | CASE NO.:  CV 10-9198 JVS (RNBx) <br><br> **[PROPOSED] LIFE INSURANCE COMPANY OF THE SOUTHWEST'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION** <br><br> Judge:        Hon. James V. Selna <br> Date:         Sept. 18, 2012 <br> Time:         1:30p.m. <br> Courtroom:  10C |

# Table of Contents

Introduction ..................................................................................................... 1

Argument ......................................................................................................... 2

I.    A Review of Policy Files Cannot Solve the Ascertainability Problem ......... 2

A.    Policy Files Cannot Determine What a Policyholder Received or When ............................................................................................... 2

B.    Policy Files Contain Conflicting Information ...................................... 5

1.    Unfounded Reliance On Illustration Print Dates....................... 6

2.    Misinterpretation of Agent Reports........................................... 8

3.    Misinterpretation of Applications............................................ 10

II.    A Questionnaire Cannot Solve the Problem ................................................ 13

III.   Plaintiffs Cannot Defer Their Ascertainability Problem by Labeling it a Question of Manageability ........................................................................ 15

Conclusion ..................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Andrews Farms v. Calcot,*
258 F.R.D. 640 (E.D. Cal. 2009) .................................................................13

*Boundas v. Abercrombie & Fitch Stores, Inc.,*
280 F.R.D. 408 (N.D. Ill. 2012)...........................................................15, 16

*Davis v. HSBC,*
10–56488, 2012 WL 3804370 (9th Cir. 2012) .............................................3

*In re Phenylpropanolamine (PPA) Products Liab. Litig.,*
214 F.R.D. 614 (W.D. Wash. 2003) ...........................................................15

*Kern v. Siemens Corp.,*
393 F.3d 120 (2d Cir. 2004) ................................................................13, 14

*O'Connor v. Boeing N. Am., Inc.,*
184 F.R.D. 311 (C.D. Cal. 1998)................................................................16

*Shurland v. Bacci Cafe & Pizzeria on Ogden, Inc.,*
271 F.R.D. 139 (N.D. Ill. 2010).................................................................13

*Stone v. Advance Am.,*
278 F.R.D. 562 (S.D. Cal. 2011) ................................................................18

*Vinole v. Countrywide Home Loans, Inc.,*
571 F.3d 935 (9th Cir. 2009) .....................................................................14

*Wal-Mart Stores, Inc. v. Dukes,*
131 S. Ct. 2541 (2011)..................................................................4, 12, 17

*Young v. Nationwide Mut. Ins. Co.,*
11-5015, 2012 WL 3828036 (6th Cir. Sept. 5, 2012)...............................12

**STATE STATUTES**

Cal. Ins. Code § 10509.956(d) ........................................................................4

**RULES**

Fed. R. Civ. P. 23(c)(2)(B) ........................................................................13

Rule 23 ..........................................................................................8, 13, 17

Rule 23(b)(1) ............................................................................................16

Rule 23(b)(3) ............................................................................................16

Rule 23's ....................................................................................................1

**OTHER AUTHORITIES**

5 Moore's Federal Practice § 23.104[2][a][ii] (2012) .................................13

California Insurance Code .........................................................................11

# INTRODUCTION

During the September 18, 2012 class certification hearing, the Court heard oral argument on, *inter alia*, the question of whether the proposed "sales illustration" subclasses fail on ascertainability grounds.  Plaintiffs argued that some combination of a policy file review and a questionnaire could resolve the factual disputes underlying the issue.  Plaintiffs further argued that they now believe that policy files contain conflicting evidence concerning illustration "use" (*i.e.*, whether  and when an illustration was used) only 5% of the time, as opposed to LSW's estimate of at least 56% of files in conflict.  The Court invited supplemental submissions.

As shown in LSW's opposition filings, and as further detailed below, the ascertainability problem is intractable:

- Policy files were never meant to be—and cannot be treated as—a complete or accurate source of information concerning what transpired during any given purchase transaction.

- Policy files contain incomplete and often conflicting information about illustration usage.  Plaintiffs reach their 5% number only by ignoring (or resolving in their favor by picking and choosing among) conflicting file evidence presented in illustrations, agent reports and applications.

- No questionnaire can save the day.  Using a questionnaire to attempt to resolve an ascertainability problem runs afoul of Rule 23's prohibition on "opt-in" classes.  In any event, here, any questionnaire would create more evidentiary issues and factual disputes than it would resolve.

- Plaintiffs cannot solve their ascertainability problem by kicking it down the road.  Months after the class certification motion was filed, Plaintiffs are still changing their minds about who is in and out — and are now saying that such a threshold question should be tabled for the indeterminate future.  This problem will not improve with age.  Case law demands that it be addressed

now.

For these reasons, and as detailed below, the Court was correct to flag a potential ascertainability problem, and given the apparent absence of a common answer, should find that the problem defeats class certification.

## ARGUMENT

### I.  A REVIEW OF POLICY FILES CANNOT SOLVE THE ASCERTAINABILITY PROBLEM

#### A.  Policy Files Cannot Determine What a Policyholder Received or When

Plaintiffs largely propose to solve their ascertainability problem by reviewing policy files to determine who received what, and when.  *See, e.g.*, Pltf. Mem. at 1-4.  The fundamental problem with this approach, however, is that policy files are not the correct tool for the task.  It is necessary to consider the entire universe of what was conveyed to each policyholder.

Policy files do not collect every document that is part of the purchase process.  *See* McDonald Dec. ¶ 7.  LSW's head of New Business explained the limited purpose of policy files:

> [A policy file] is not designed to (and does not) include every single document that is provided to a potential policyholder in the application process.  It is intended to include only the administrative information LSW needs to determine whether to issue a policy (to a great extent, the underwriting process), the terms of that policy, and subsequent communication directly between LSW and the customer (e.g., annual statements).  For this reason, the policyholder file is not intended to be a comprehensive set of all information exchanged during the sales process.  It is impossible to tell, just by looking at the contents of LSW's files, every piece of information and every document that was provided to policyholders.

*Id.* In order to resolve what documents and information a given Paragon or Provider purchaser received, individualized fact finding (*i.e.,* discovery and a trial for each putative class member) will be necessary.

Indeed, any approach to resolving UCL and fraud claims that fails to consider the entire universe of documents provided to class members would run afoul of *Davis v. HSBC*, 10–56488, 2012 WL 3804370 (9th Cir. 2012) (all disclosures have to be considered in adjudicating UCL and common-law fraud claims).[1]   Plaintiffs have not addressed *Davis*, although LSW raised it during oral argument.[2]   Rather, Plaintiffs' only argument for limiting inquiry to illustrations (and indeed to only those illustrations appearing in policy files) is that LSW's agents certify that they do not say anything inconsistent with illustrations.  *See* Tr. 54:6-24.  Plaintiffs argue that the agents' certifications bring this case within *Yokoyama*.  *Id.* 54:6-12. Indeed, the  first page of Plaintiffs' Reply asserts that "LSW's certification requirement is *identical* to that imposed by the insurance company in *Yokoyama*." Reply 1 (emphasis added).

But Plaintiffs are wrong.  In *Yokoyama*, an insurance company required its brokers to certify that they "made no statements which *differ[ed]* in any significant manner from [the Company's disclosure] material." 594 F.3d 1087, 1090 (9th Cir. 2010) (emphasis

---

[1]  *Davis* also suggests that the failures of all three named plaintiffs to read the disclosures in their policies are "fatal." *Compare Davis*, 2012 WL 3804370, at *7 ("Fatal to Davis's claim is the undisputed fact that he failed to read the Important Terms & Disclosure Statement… it is not reasonable to fail to read a contract before signing it.") *with* Supplemental Declaration of Joel Fleming ("Fleming Dec."), Ex. A 208:11-15; Fleming Dec., Ex. B 219:6-8; Fleming Dec., Ex. C 156:10-2.

[2]  *Davis* was decided after LSW filed its Opposition.

added).[3]  Here, LSW uses a distinct certification, imposed by California statute, which calls for all insurance agents to certify only that they "have made no statements that are *inconsistent* with the illustration." *See, e.g.*, Walker Dec., Ex. A at 21 (emphasis added); Cal. Ins. Code §10509.956(d).

This distinction is key because disclosures made by LSW and agents *may differ from* illustrations; what they cannot do is *contradict* illustrations.  For example, Joyce Walker had a conversation with her agent about the fees she would be charged.  Shapiro Dec., Ex. U.  And she received a handwritten disclosure that she would be charged fees beyond a single Monthly Administrative Charge, including mortality charges and a 5% Premium Expense. Shapiro Dec., Ex. V at JW002715 ("What charges are deducted…?"; "Premium—5%... Mortality").  These disclosures did not contradict her illustration (which included all fees in calculations but did not list them).  They supplemented it.  LSW has shown through agent Declarations and voluminous marketing documents that other salient disclosures also are made.  They too *supplement* the illustration.

Moreover, that LSW's certification is imposed by the state of California (Cal. Ins. Code §10509.956(d); Reply at 10) further undermines Plaintiffs' position.  If Plaintiffs are correct, then agents are superfluous—they cannot say a thing that is not already in the illustration.  That makes no sense.  Why have a detailed licensing and regulatory regime for

---

[3] *Yokoyama*—which predates *Dukes* and *Mazza*—held that the District Court of Hawaii had misapplied Hawaii law in determining whether individualized reliance was required under Hawaii's consumer protection statute. 594 F.3d 1087, 1094 (9th Cir. 2010). *Yokoyama* did not hold that a class should be certified.  It simply remanded for another round of class certification briefing. *Id.*

agents at all?[4]   And why were Mr. Howlett and Ms. Spooner provided a "binder" of documents by their independent agents — in addition to what those agents wrote on the "white board" during the many of hours of meetings they had learning about the product?[5]

### B.   Policy Files Contain Conflicting Information

Even focusing myopically on policy files alone, pervasive evidentiary conflicts defeat certification based on ascertainability.   In its class certification opposition papers, LSW showed that 30% of policy files contain no evidence of sales illustration use, [6] that another 56% of files have conflicting evidence, and that no file can conclusively establish sales illustration "use."  Perla Declaration Concerning the Sample ¶¶ 7-10.  Prior to the hearing, Plaintiffs' class certification filings did not dispute this showing.  Rather, even they admitted that a large percentage of the class had no evidence of sales illustration use.  *See* Dinglasan Dec. ¶ 9.

Now, however, Plaintiffs offer a "revision" of their findings based on what they say is "a more detailed review" of the files.  Pltf. Mem. at 2; Dinglasan Supp. Dec. ¶ 2.  Plaintiffs now say they have found conflicting file evidence only 5% of the time.  *See* Pltf. Mem. at 2.  As an initial matter, the very fact of this "revision" — unveiled during oral

---

[4] That LSW's certification is a requirement of state law also means that it would have been present in *Fairbanks* and *Kaldenbach*, two other California insurance class actions.  The courts there neither believed that the state was forbidding agents from making additional disclosures nor restricted consideration of disclosures outside of illustrations in rejecting class certification. 197 Cal. App. 4th 544, 564 (2011); 178 Cal. App. 4th 830, 847 (2009).
[5] *See* Shapiro Dec., Ex. C 72:11-20 ("binder");106:11-107:4 ("white board"); Shapiro Ex. B 67:4-11 (Howlett and Spooner had a dozen meetings over fourteen months).
[6] LSW does not require illustration use before application. McDonald Dec. ¶ 13-14.  Thus, if an illustration was used prior to application, it was simply because an agent decided to do so.

argument — spotlights the problem:  even class counsel, with months of time at their disposal to review the files (and every incentive to get it right or at least to be consistent) cannot seem to settle on what they think the files show.  More importantly, Plaintiffs continue to make the following errors in their revised analysis.

### 1.    Unfounded Reliance On Illustration Print Dates

Because Plaintiffs' proposed subclasses are limited to policyholders who received what Plaintiffs call sales illustrations (*i.e.,* illustrations at or prior to application)*,* determining *when* an illustration was used (if ever) is critical.  The lynchpin of Plaintiffs' revised analysis is that an illustration's print date is treated as *conclusive evidence* that the illustration was *used* with a policyholder *on that date*.  *See* Dinglasan Supp. Dec. ¶ 4 ("I compared the print date on the illustration with the date that the application for the policy was signed.").

That conclusion—print date equals use date—is unfounded.  None of the named Plaintiffs claims to have reviewed his or her challenged illustrations on the print dates.[7]  Further, the sample of 400 proves that illustration print date is not a reliable proxy for the date of illustration usage.  An illustration signature date (*i.e.,* when a human being put pen to paper) constitutes better evidence of the timing of use than a print date.  But, on 434 of

---

[7] Walker received an illustration prepared on October 3, 2007 that she never signed. Walker Dec., Ex. A.  The illustration she signed on January 11, 2008 was prepared on December 27, 2007. Fleming Dec., Ex. D. Howlett and Spooner received illustrations prepared July 27, 2007, but neither signed until July 30, 2007. Howlett Dec., Ex. A; Spooner Dec., Ex. A. Ms. Spooner was unsure whether she first saw her illustration before or after she dictated her application. Fleming Dec., Ex. C 232:6:9.

the 491 illustrations that are signed and dated and appear in the sample files (88% of them),
*the signature date does not match the print date, it falls later.  See* Supplemental
Declaration of Timothy Perla ("Perla Dec.") at 4.  This fatally undermines Plaintiffs'
reliance on print dates as a proxy for date of use.[8]

Furthermore, even using signature dates as a proxy for date-of-use would not solve
the ascertainability problem because that too would  just lead to yet more file
contradictions and uncertainty.  For the 491 signed/dated illustrations, the signature date
fell a median of 12 days after the print date.  *See* Perla Dec. at 4.   And that time gap
matters.  The sample contains 122 illustrations for which print date precedes or matches
application date (*i.e.,* what Plaintiffs deemed to be sales illustrations). Of those, 30 bear a
signature date *after* application date.  *See* Perla Dec. at 5.  This proves two things.  First,
simply looking at signature date instead of print date reduces by 25% the number of sales
illustrations that precede or are contemporaneous with the application date   Second, agents
do very often print an illustration prior to application, but do not use it until after.

Finally, even a signature date could not appropriately be treated as conclusive or
reliable evidence of illustration use.  Plaintiffs can scarcely claim otherwise.  Ms. Walker
claims to have been misled by a pre-application illustration that she never signed.  Walker
Dec., Ex. A at 21.  But LSW's file also contains a second illustration.  It was printed *and*
*signed* post-application, and showed a pattern of higher premium payments that matched

---

[8] To the extent the files also contain unsigned illustrations as well, they offer no evidence
concerning the timing of use (if any).

her actual underwriting class.  Yet during her deposition, Ms. Walker testified that she did *not receive or review this latter illustration,* even though she acknowledges that her signature appears.  *See* Fleming Dec. Ex. A 205:9-210:10.  Were a fact finder simply to review her policy file, they would likely draw the common sense conclusion that the signed illustration was used—but according to Ms. Walker, not so.[9]

In short, the presence of an illustration in a policy file cannot be counted as evidence of illustration "use"—and certainly not conclusive evidence establishing *when* an illustration was used.  Plaintiffs err because they rely on illustration print dates as conclusive evidence of use on those dates.

### 2.       Misinterpretation of Agent Reports

Plaintiffs also address inaccurately the Agent Reports in files.  Specifically, sometimes (not always), files contain an Agent Report, which is a document that may be submitted to LSW at the time of application.  Part 1, Question 7 of the Agent Report asks the agent to "List any sales materials, *including illustrations*, used relating to the new application."  *See* Dinglasan Supp. Dec. ¶ 6 (emphasis added).

According to the Dinglasan Declaration, if an illustration is listed in response to Question 7, Plaintiffs assume that response must be conclusive evidence that an illustration was use prior to application.  *See id.*   Plaintiffs then also assume that an illustration must

---

[9] Indeed, twice in Plaintiffs' filing they emphasize that it would improper to look only at Ms. Walker's file given that she cleared up the obvious factual inconsistency in her "Declaration" and her "testimony."  Pltf. Mem. at 4. This is precisely the problem – if we need policyholders to testify at depositions and in affidavits to resolve threshold factual disputes, we don't have an ascertainable class under Rule 23.

not have been used *only* if the answer specifically states "N/A" or "none."  *See id.* ¶ 7.  In all other situations, Plaintiffs treated agent reports as irrelevant, that is, as providing no evidence concerning illustration use.  *See id.* ("Where Part 7 was blank or where it listed some items but did not list an illustration I treated the agent's report as not indicating one way or the other whether a sales illustration was used.").

This is not a reasonable methodology.  Question 7 *specifically asks about illustrations*.  Thus, if an agent does not list an illustration—irrespective of whether they wrote "N/A" or something else—that plainly would be evidence that no illustration was used.  For instance, very often, an agent would list "brochures" as the materials used—in other words, the agent was asked about illustrations, and listed only something else (brochures).  By any fair minded analysis, this is evidence that no illustration was used. There are over 30 instances in which an agent report lists only materials other than an illustration—all instances in which Plaintiffs err by failing to acknowledge evidence against illustration use.  Perla Dec. ¶ 3.

Plaintiffs compound their error by treating any reference to a "quick calc" as evidence that a sales illustration was supplied to an applicant.  *See* Dinglasan Supp. Dec. ¶ 6.  A "quick calc" is a summary calculation that looks nothing like the sales illustrations that the Complaint attacks; it is a completely different document.[10]  More importantly, as Plaintiffs concede, a quick calc is *for agent use only*.  Dinglasan Supp. Dec. ¶ 6.  Question

---

[10] This is self-evident from the example quick calc that Plaintiffs attached to the Dinglasan Declaration. *See* Dinglasan Supp. Dec., Ex. C.

7 of the agent report asks the agent to list what the agent "used." A response indicating that an agent "used" a quick calc does not mean that the agent also *provided it to an applicant*.

Finally, Plaintiffs further err by treating any reference to "IC Solutions" or "ICS" as conclusive evidence that an applicant received a sales illustration. *See* Dinglasan Supp. Dec. ¶ 6. But, as with quick calcs, such a response only raises questions: that an agent "used" the software does not mean that a sales illustration was provided to an applicant. It could be, for instance, that the agent ran a quick calc, and never printed or showed a sales illustration to anyone.

### 3.   Misinterpretation of Applications

Finally, Plaintiffs also err in their treatment of applications and, in particular, the sales certification (*i.e.,* "The box below MUST be checked if a signed illustration of the policy applied for is NOT enclosed with this application"). The error is twofold.

First, Plaintiffs treat an unchecked box as conclusive evidence that a sales illustration was used. *See* Dinglasan Supp. Dec. ¶ 9. This evidentiary assumption is inappropriate, however, because the certification does not speak to what was used, but rather what was "enclosed." *See, e.g.*, Shapiro Dec., Ex. AA. If, for example, the box is unchecked, but no illustration appears in the file, that is a conflict in need of fact finding.

Second, Plaintiffs treat a checked box as neutral, because they speculate that there could still be an illustration that does not match "the policy applied for." *See* Dinglasan Supp. Dec. ¶ 9. But this is also not a reasonable evidentiary conclusion: even if Plaintiffs' interpretation of "the policy applied for" is accepted, then the checkbox shows that an

illustration of the policy applied for was not received.   At most, that is one piece of

evidence—not some dispositive, cure-all presumption or irrefutable evidentiary

inference—that no illustration was used.  Whether illustrations that do not match the policy

might still exist somewhere is a matter for class-defeating fact-finding.[11]

* * *

The salient point is simple:  the files are inconclusive and no class certification

Declaration can resolve the conflicts.  Determining whether or when an illustration was

used is a matter for individualized fact finding.  In their Memorandum, Plaintiffs

essentially prove the point.  During oral argument, LSW showed that Ms. Walker's own

policy file is deeply confusing and contradictory (*i.e.,* she claims to have received an

illustration she never signed, and not to have received one she did sign).  Plaintiffs respond

by *citing her deposition testimony*.  Pltf. Mem. at 4.  LSW wholeheartedly agrees:  the right

way to fact-find is to inquire individually of each policyholder and agent, not to review a

policy file in isolation.

Plaintiffs cannot alter this result by blaming LSW for what they characterize as

"deficient" recordkeeping.  Pltf. Mem. 7.  It is unclear what point Plaintiffs are making

—that their class certification burden should melt away because policy files are not in their

preferred form?  That would have no basis in the law.  Nothing in the California Insurance

---

[11] It is also unclear why Plaintiffs believe that an illustration that is expressly *not* of the
policy applied for can serve as the basis for a claim of misrepresentation concerning the
*different* policy that is applied for.

Code requires insurers to track whether or when a sales illustration is provided to a policyholder. Policy files simply were not designed to capture sales illustration use—this does not make the files deficient, just (unsurprisingly) ill-suited to a task they were never intended to perform.

Courts and plaintiffs must take defendants as they find them. In *Dukes*, the defendant had a class-defeating policy of "allowing discretion by local supervisors over employment matters." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2554 (2011). Here, LSW has a class-defeating policy of not uniformly tracking when illustrations are given to potential policyholders. Both "polic[ies] against having uniform … practices" are "very common and presumptively reasonable." *Id.* Both defeat certification.

The Sixth Circuit's decision in *Young* is not to the contrary. There, the problem was volume, not the insufficiency of the records. The court found that determining class membership could require reviewing millions of files, and was willing to certify nonetheless. But, unlike here, there was no record evidence that the files would be insufficient for the task, or produce inaccurate conclusions. *Young v. Nationwide Mut. Ins. Co.*, 11-5015, 2012 WL 3828036, at *6 (6th Cir. Sept. 5, 2012) ("The district court noted that an error rate was essentially unknown and that [defendant's expert's] error range was not dispositive for" the program proposed to be used). Here, the problem is not simply one of sheer volume (though one can reasonably conclude that it is, *Young* notwithstanding),

but rather that files simply are not an appropriate tool for resolving ascertainability concerns.[12]

## II.    A QUESTIONNAIRE CANNOT SOLVE THE PROBLEM

In its Tentative Order and during oral argument, the Court questioned whether a questionnaire could alleviate ascertainability concerns.  For two reasons, it could not.

*First*, requiring that policyholders return a questionnaire or evidence in order to become (sub)class members would create an impermissible "opt in" class.  *See* Fed. R. Civ. P. 23(c)(2)(B) (Notice must clearly and concisely state that "the court will *exclude* from the class any member who requests exclusion") (emphasis added).  By adding the "opt out" requirement to Rule 23 in the 1996 amendments, Congress *prohibited* "opt in" provisions by implication.  *Andrews Farms v. Calcot*, 258 F.R.D. 640, 656 (E.D. Cal. 2009) (citing *Kern v. Siemens Corp.*, 393 F.3d 120, 124 (2d Cir. 2004)) (emphasis in original); *see also* 5 Moore's Federal Practice § 23.104[2][a][ii] (2012) ("there is no authority for establishing 'opt in' classes in which the class members must take action to be included in the class. Indeed, courts that have considered 'opt-in' procedures have rejected them as contrary to Rule 23").  As the Second Circuit explained at length in *Kern v. Siemens Corp.*, 393 F.3d 120, 124 (2d Cir. 2004), procedures that require the taking of action in order to be in a class

---

[12] Plaintiffs' citation to *Shurland* is misleading.  There, the defendant had *destroyed* its records of customer names. *Shurland v. Bacci Cafe & Pizzeria on Ogden, Inc.*, 271 F.R.D. 139, 145 (N.D. Ill. 2010) ("Class actions cannot be defeated by destroying records.") (quoting *Appleton Electric Co. v. Advance–United Expressways*, 494 F.2d 126, 135, 139 (7th Cir.1974)).  There is no such allegation here.

(*e.g.,* return questionnaire, submit evidence) are "de facto" impermissible opt-in classes. *Kern v. Siemens Corp.*, 393 F.3d 120, 124 (2d Cir. 2004) (collecting many authorities).

The case cited in the tentative ruling, *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 947 (9th Cir. 2009), is not to the contrary.  There, the Court referred to the possibility of "innovative procedural tools," but did *not* approve their use in that case—and then cautioned that they could not be used to conduct "a fact-intensive, individual analysis" of each class member's claim.   *Id.* at 947.

Nor are Plaintiffs' cases dispositive.  The cases Plaintiffs cite concerning questionnaires (*see* Reply at 5 n.18; Pltf. Mem. at 9) posit only that questionnaires *could perhaps* be used to resolve simple, objective questions (*e.g.*, whether a house has a certain kind of windows) unlike the questions that would be required here.  The dockets of those cases reflect no evidence that such questionnaires were ever actually used, much less used to resolve factual disputes that another litigant has a right to litigate.

*Second*, any questionnaire could only exacerbate evidentiary issues, and would hardly be the "straightforward, objective inquiry" that Plaintiffs assert.  Pltf. Mem. at 9.  At very least, any questionnaire would require the policyholder to answer questions, including but not limited to (1) whether the policyholder received any illustration;  (2) whether the policyholder signed the illustration; (3) whether the policyholder received the illustration before or after the time of policy delivery; (4) whether the policyholder received the "One Policy Fee" page; (5) whether the policyholder received the optional report that enumerated policy costs; (6) whether the illustration depicted loans; (7) what other

disclosures were made to the policyholder; (8) when all of this occurred in relation to the application.  If a policyholder received more than one illustration—and there is record evidence that this happens frequently (Perla Dec. ¶ 6)—he or she would need to answer each of these questions multiple times.

An absent class member could misremember any or all of the events that led him or her to purchase a policy.  *See In re Phenylpropanolamine (PPA) Products Liab. Litig.*, 214 F.R.D. 614, 619 (W.D. Wash. 2003) (rejecting use of sworn affidavits by class members where class members would be asked to recall subjective details, more than two years old, which would "sorely tax [their] memories").[13]  These are not the kinds of simple, objective questions that can be resolved in a questionnaire in a manner consistent with due process, fairness, and Plaintiffs' discharge of their burden of proof.

## III.   PLAINTIFFS CANNOT DEFER THEIR ASCERTAINABILITY PROBLEM BY LABELING IT A QUESTION OF MANAGEABILITY

Finally, Plaintiffs suggest that a class can be certified even if there is no precise, objective method for determining who is in the class.  *See* Pltf. Mem. at 10-13.  This position is incorrect.

Some of Plaintiffs' own cases explicitly undermine Plaintiffs' argument.  *Boundas*, for example, recognized that, "[a]lthough the identity of individual class members need not

---

[13] For example, some agents display illustrations on a computer screen. *See* Foulk Dec. ¶¶ 28, 30. Policyholders simply cannot be expected to remember (i) whether they were shown illustrations on a computer; (ii) when they were shown those illustrations; and (iii) whether those illustrations contained an optional costs report.  The same challenges would lie if illustrations had been discarded.

be ascertained before class certification, the membership of the class must be ascertainable" because "individual class members must receive the best notice practicable and have an opportunity to opt out." *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 417 (N.D. Ill. 2012) (quoting Manual for Complex Litigation, supra, § 21.222, at 270 (4th ed. 2004)). *See also O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998) ("due to notice requirements, class definitions of actions maintained under Rule 23(b)(3) command greater precision than those brought under Rule 23(b)(1) or (b)(2)."). This requires a class definition that is "precise, objective, and presently ascertainable." *Id.*; *Boundas* at 417 (quoting Manual for Complex Litigation, supra, § 21.222, at 270).

Similarly, in *Galvan*, this Court recognized that "[t]he class definition must be clear in its applicability so that it will be clear later on whose rights are merged into the judgment, that is, who gets the benefit of any relief and who gets the burden of any loss." *Galvan v. KDI Distribution Inc.*, SACV 08-0999-JVS ANX, 2011 WL 5116585, at *3 (C.D. Cal. Oct. 25, 2011) (quoting *Xavier v. Phillip Morris USA, Inc.*, No. C 10–02067

WHA, 2011 WL 1464942, at *12 (N.D.Cal. April 18, 2011)). [14]  If a class is certified and LSW successfully moves for summary judgment, the Court and both parties will need to know who is subject to res judicata.  So the question is not whether the leg work to actually ascertain the class should be completed now or later, it is *whether a class can be ascertained at all*.  Here, as detailed above, it cannot.

Finally, regardless whether LSW is entitled to a jury, a class "cannot be certified on the premise that [LSW] will not be entitled to litigate" the question of whether and when an illustration was received. *See Dukes*, 131 S. Ct. at 2560-61 ("Wal–Mart is entitled to individualized determinations of each employee's eligibility for backpay."). Leaving aside what the Seventh Amendment might say, "the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right[.]'" *Dukes*, 131 S. Ct. at 2561 (citing 28 U.S.C. § 2072(b)).  And LSW has a Due Process right to contest class membership.

In *Stone v. Advance America*, for example, plaintiffs sought to certify a UCL class where class membership would be determined by "self-identify[ing] sworn affidavits that [class members] principally spoke Spanish when they took out payday loans at

---

[14] The other cases that Plaintiffs cite as approving "similar case management tools" are distinguishable. In *Bayer*, the court suggested that  claim forms or affidavits could be appropriate because the claims involved were small—a factor not present here.  *See* 2011 WL 5878376, at *4 (D.N.J. Nov. 22, 2011) (quoting 3 Newberg on Class Actions § 10:12 (4th ed. 2002) ("Methods of claim verification may also vary with the… the size of the claims involved. A simple statement or affidavit may be sufficient where claims are small[.]")).  In *TFT-LCD Antitrust Litigation*, "defendants held an overwhelming market share" meaning that "almost all LCD products sold in the United States" fell within the class. 2012 WL 253298, at *2 (N.D. Cal. Jan. 26, 2012).

Defendants' stores." *Stone v. Advance Am.*, 278 F.R.D. 562, 571 (S.D. Cal. 2011).  The court rejected this approach.  It found that there were "due process concerns" and held that defendants were "entitled to examine the individual customers." *Id.* at 570.  This Court should do the same.

## CONCLUSION

The Court should deny Plaintiffs' Motion for Class Certification.


DATED:  October 2, 2012             Respectfully submitted,

                                    WILMER CUTLER PICKERING HALE AND
                                    DORR LLP


                                    By:  */s/ Jonathan A. Shapiro*
                                         Jonathan A. Shapiro
                                         Andrea J. Robinson
                                         Timothy J. Perla

                                    Attorneys For Defendant
                                    Life Insurance Company of the Southwest

**PROOF OF SERVICE**

I am a resident of the Commonwealth of Massachusetts, over the age of eighteen years, and not a party to the within action.  My business address is Wilmer Cutler Pickering Hale and Dorr LLP, 60 State Street, Boston, Massachusetts 02109.  On October 2, 2012, I served the within document(s):

[PROPOSED] SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION

I placed the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail addressed as set forth below.

I personally caused to be hand delivered the document(s) listed above to the person(s) at the address(es) set forth below.

I emailed the document(s) listed above to the person(s) at the address(es) set forth below.

☒    I electronically filed the document(s) listed above via the CM/ECF system.

> Brian P. Brosnahan
> (bbrosnahan@kasowitz.com)
> Charles N. Freiberg j
> (cfreiberg@kasowitz.com)
> Jacob N. Foster
> (jfoster@kasowitz.com)
> KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
> 101 California Street, Suite 2300
> San Francisco, CA 94111
>
> Harvey R. Levine
> (lsmh@levinelaw.com)
> LEVINE & MILLER
> 550 West C. Street, Suite 1810
> San Diego, CA 92101-8596
>
>
> */s/ Joel A. Fleming*
> Joel A. Fleming