**EXHIBIT 1:  [PROPOSED] REPLY TO LSW'S SUBSTITUTED SUPPLEMENTAL MEMORANDUM**

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
CHARLES N. FREIBERG (SBN 70890)
BRIAN P. BROSNAHAN (SBN 112894)
JACOB N. FOSTER (SBN 250785)
101 California Street, Suite 2300
San Francisco, California 94111
Telephone: (415) 421-6140
Facsimile: (415) 398-5030

LEVINE & MILLER
HARVEY R. LEVINE (SBN 61879)
CRAIG A. MILLER (SBN 116030)
LEVINE & MILLER
550 West C Street, Suite 1810
San Diego, CA 92101-8596
Telephone: (619) 231-9449
Facsimile: (619) 231-8638

Attorneys for Plaintiffs
JOYCE WALKER, KIM BRUCE HOWLETT,
and MURIEL SPOONER, on behalf of themselves
and all others similarly situated

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOYCE WALKER, KIM BRUCE HOWLETT, and MURIEL SPOONER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LIFE INSURANCE COMPANY OF THE SOUTHWEST, a Texas corporation,<br><br>Defendant. | **CLASS ACTION**<br><br>CASE NO.: CV 10-9198 JVS (RNBx)<br><br>Formerly Case No.: 3:10-cv -04852 JSW<br>from Northern District of California<br><br>**[PROPOSED] PLAINTIFFS' REPLY TO LSW'S SUBSTITUTE SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>District Judge James V. Selna<br>Date:   Sept. 18, 2012<br>Court: 10C |

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

# TABLE OF CONTENTS

**Page**

I.    LSW'S ARGUMENTS ABOUT *YOKOYAMA* ARE UNAVAILING .............................. 1

II.   LSW'S ARGUMENTS ABOUT *DAVIS* ARE UNAVAILING ......................... 3

III.  LSW' S CHANGING POSITIONS CANNOT HIDE THE FACT THAT THE POLICY
      FILES CONTAIN LITTLE CONFLICTING INFORMATION........................................ 4

      A.    LSW'S NEW POSITION THAT PRINT DATES ARE IRRELEVANT IS
            INCORRECT.................................................................... 7

      B.    THE PRESENCE OF A SIGNED BATCH ILLUSTRATION IN A FILE IDOES
            NOT MEAN THAT NO SALES ILLUSTRATION WAS USED..................... 10

      C.    LSW IGNORES THE EVIDENCE CONCERNING AGENT'S REPORTS. ...... 11

      D.    THE APPLICATIONS CREATE FEW, IF ANY, CONFLICTS. ....................... 12

IV.   LSW MISCONSTRUES *YOUNG V. NATIONWIDE MUTUAL INS. CO.* ...................... 13

V.    A SIMPLE QUESTIONNAIRE CAN DETERMINE SUBCLASS MEMBERSHIP. .... 14

VI.   LSW IS INCORRECT THAT THE CLASS IS NOT ASCERTAINABLE. ................... 17

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1

## <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

**CASES**

*Andrews Farms v. Calcot,*
    258 F.R.D. 640 (E.D. Cal. 2009) ........................................................ 15

*Balasanyan v. Nordstrom, Inc.,*
    2012 U.S. Dist. LEXIS 74777 (S.D. Cal. May 30, 2012) ............... 17

*Boundas v. Abercrombie & Fitch Stores, Inc.,*
    280 F.R.D. 408 (N.D. Ill. 2012) ...................................................... 17

*Chesner v. Stewart Title Guar. Co.,*
    2008 U.S. Dist. LEXIS 19303 (N.D. Oh. Jan. 23, 2008) ............... 14

*Davis v. HSBC,*
    2012 U.S. App. LEXIS 18503 (9th Cir. Aug. 21, 2012) ...............2, 3

*Ellis v. Costco Wholesale Corp.,*
    2012 U.S. Dist. LEXIS 137418 (N.D. Cal. Sept. 25, 2012) ........... 18

*Hinckley v. Bechtel Corp.,*
    41 Cal. App. 3d 206 (1974) ............................................................ 12

*In re Blood Reagents Antitrust Litig.,*
    2012 U.S. Dist. LEXIS 118727 (E.D. Pa. Aug. 22, 2012) ............. 18

*In re Brazilian Blowout Litig.,*
    2011 U.S. Dist. LEXIS 40158 (C.D. Cal. Apr. 12, 2011) ................. 4

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,*
    209 F.R.D. 323 (S.D.N.Y. 2002) .................................................... 17

*In re Phenylpropanolamine (PPA) Prod. Liab. Litig.,*
    214 F.R.D. 614 (W.D. Wash. 2003) ............................................... 15

*Kennedy v. Jackson Nat'l Life. Ins. Co.,*
    2010 U.S. Dist. LEXIS 63604 (N.D. Cal. June 23, 2010) ............... 4

*Kern v. Siemens Corp.,*
    393 F.3d 120 (2d Cir. 2004) ..................................................... 14, 15

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
    571 F.3d 672 (7th Cir. 2009) ...................................................................... 4

*Roderick v. XTO Energy, Inc.*,
    281 F.R.D. 477 (D. Kan. 2012) ................................................................ 17

*Shurland v. Bacci*,
    271 F.R.D. 139 (N.D. Ill. 2010) ............................................................... 13

*Stone v. Advance Am., Cash Advance Ctrs. Inc.*,
    278 F.R.D. 562 (S.D. Cal. 2011) .............................................................. 18

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S.Ct. 2541 (2011)...................................................................... 17, 18

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
    594 F.3d 1087 (9th Cir. 2008) ................................................................... 1

*Young v. Nationwide Mut. Ins. Co.*,
    2012 U.S. App. LEXIS 18625 (6th Cir. Sept. 5, 2012)............................... 13

**STATUTES**

Cal. Ins. Code §10509.956(e) ......................................................................... 2

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

## I.   LSW'S ARGUMENTS ABOUT *YOKOYAMA* ARE UNAVAILING

LSW contends that this Court should refuse to follow *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1093 (9th Cir. 2008) because the insurance company in that case prohibited its agents from making oral statements that "differ in any significant manner" from written documentation, while LSW prohibits its agents from making statements "that are inconsistent."  LSW's Substitute Supplemental Memorandum in Opposition to Class Certification (Dkt. 346) ("LSW's Sub. Memo.") at 3-4.  This is a distinction without a difference. The Ninth Circuit in *Yokoyama* interpreted the insurer's certification as requiring agents "to certify that nothing was said that is inconsistent" – the exact requirement imposed by LSW on its agents.  *Yokoyama*, 594 F.3d at 1090. Nothing about the wording of the respective certifications calls into question the Ninth Circuit's rationale that claims resting on written documentation "avoids individual variance" and means that certification "does not require the fact-finder to parse what oral representations each broker made to each plaintiff."  *Id.* at 1093.[1]

LSW's contention that oral disclosures by agents "*supplement* the illustration" also ignores the record:

- Volatility and Tax:  There is no evidence that an agent made even a single policyholder aware of the extremely high likelihood of lapse and the interaction between policy design and either market volatility or the tax laws.  Pls. Reply at 2-4.

- Fees:  There is no evidence that any agent dispelled the illustration's representation that the specified amount of the Monthly Administrative Charge (the "One Policy Fee" identified in the illustration) includes all fees.

---

[1] LSW also cites *Fairbanks* and *Kaldenbach*, but as Plaintiffs explained in their Opening and Reply briefs, neither case considered the certification requirement discussed in *Yokoyama*, and the plaintiffs in those cases could not argue that oral representations were irrelevant because their claims *were based* on oral representations made to them by agents.  Pls. Op. Br. at 18-19, Pls. Reply at 8-9.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

LSW asserts that Ms. Walker's agent disclosed policy fees,[2] but LSW submitted no evidence from Ms. Walker's agent, and her testimony remains undisputed that he never dispelled the false impression that the stated amount of the Monthly Administrative Charge (the One Policy Fee depicted in the illustration) included all fees.  Walker Dec. ¶¶5, 12; Walker Reply Dec. ¶4.

- Guarantee:  There is no evidence that any agent disclosed that the guaranteed values in the illustrations are overstated because they are based on true annual (i.e., prospective) crediting, or that the representation in the illustration is false that "[t]he policy as illustrated on a guaranteed basis will provide coverage for [a certain number of policy years]," or that no guaranteed interest would be provided upon lapse.

- Monthly Administrative Charge ("MAC") Reduction:  If, as LSW suggests, some agents disclose that the reduction is not guaranteed, this would not supplement the illustration, but contradict it, and LSW does not dispute that it should be estopped from relying on an argument that a handful of agents may have contradicted the illustration.

- Current Basis:  There is no evidence that any agent disclosed that the Current Basis values are significantly inflated by inclusion of nonguaranteed benefits not currently provided, and, indeed, California law requires that if a non-guaranteed element, such as the Account Value Enhancement ("AVE") is mentioned in an illustration, it must be "described in the contract." Cal. Ins. Code §10509.956(e).  Thus, even if an agent told a policyholder that the AVE is not currently provided to anyone, LSW's illustration would still violate the statute because the AVE is referenced nowhere in the contract. Brosnahan Decl. Ex. M (Dkt. 227-1).

LSW also contends that its requirement that agents not make statements inconsistent with the illustration renders agents superfluous, but this argument is frivolous.  Plaintiffs do not dispute that agents can provide information so long as it is not inconsistent with the illustration.  The uncontroverted testimony by the named Plaintiffs and evidentiary record in this case demonstrates that none of the information provided by agents contradicted the illustration or dispelled the deceptions that are the basis of Plaintiffs' claims.

---

[2] LSW concedes *sub silentio* that Ms. Walker's agent did not disclose information that was relevant to any of her other claims.

## II.   LSW'S ARGUMENTS ABOUT *DAVIS* ARE UNAVAILING

LSW's citation to *Davis v. HSBC*, 2012 U.S. App. LEXIS 18503, *15 (9th Cir. Aug. 21, 2012) provides no grounds for denying certification.  First, *Davis* held that determining whether a practice is deceptive involves an objective test that focuses on "the ordinary consumer acting reasonably under the circumstances."  *Id.* at *13-14.  This, of course, supports certification because it renders it unnecessary for the Court to inquire into individual consumers' subjective understanding of the illustration.  Second, *Davis* held that dismissal of the complaint was warranted under the facts of that case because no reasonable consumer was likely to be deceived by the defendant's advertisements.  In *Davis*, the advertisement contained no statement that was false, plaintiffs' claim that a "reward" credit card implied that there was no offsetting fee "defie[d] common sense," the named plaintiff was presented with an "Important Terms & Disclosure Statement" disclosing the annual fee prior to application, and he checked a box certifying that he accepted the terms and conditions (*e.g.*, the fee) prior to submitting his credit card application.  *Id.* at *13-19.

Unlike *Davis*, this Court already has held that LSW's illustrations are deceptive and denied its motion for judgment on the pleadings; indeed, on this motion, LSW does not contest that the illustration is deceptive.  Unlike *Davis*, the named Plaintiffs' testimony is uncontroverted that they received no written (or oral) disclosures prior to their application that corrected the deception in the illustration.  To the extent that LSW argues that its policy and Buyer's Guide correct the deception in the illustration, this presents another common issue that supports certification because LSW requires that these same written disclosures be delivered to the class.  Pls. Reply at 11-13

Notably, LSW has presented no evidence that even a single policyholder – let alone a significant number -- received any oral or written disclosure that corrected the deception in LSW's illustration.  Though the parties negotiated a

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

script allowing LSW to contact absent class members, LSW submitted no evidence of individualized policyholder knowledge in connection with its opposition to Plaintiffs' motion.  LSW's speculation that some unidentified class members received adequate disclosure is insufficient to defeat class certification, *see In re Brazilian Blowout Litig.*, 2011 U.S. Dist. LEXIS 40158, *24-26 & n.10 (C.D. Cal. Apr. 12, 2011), particularly since even adequate disclosure to some manageable number of class members would be insufficient to upset the predominance of common issues and defeat class certification.  *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677-78 (7th Cir. 2009); *Kennedy v. Jackson Nat'l Life. Ins. Co.*, 2010 U.S. Dist. LEXIS 63604, *17-21(N.D. Cal. June 23, 2010) ("[T]he independent voluntary actions taken by a handful of Defendant's agents do not defeat the predominance of common questions of fact concerning whether Defendant adequately disclosed this information.").

## III. LSW' S CHANGING POSITIONS CANNOT HIDE THE FACT THAT THE POLICY FILES CONTAIN LITTLE CONFLICTING INFORMATION.

LSW's discussion of the policy files (at pp. 5-11) blends misrepresentations with new and evolving positions in an attempt to confuse the Court about the state of the documentary record.  Whereas Plaintiffs submitted as Exhibit A to the Supplemental Dinglasan Declaration (Dkt. 339) a policy-by-policy description of all 400 policy files, LSW responds only with aggregated data on entirely separate topics that are irrelevant to the question of whether a policyholder received a sales illustration.  That data, contained in the Supplemental Declaration of Timothy Perla, is addressed below, but it should be noted at the outset that nowhere does LSW quarrel with the accuracy of Exhibit A to the Supplemental Dinglasan Declaration or the policy counts based thereon.  Instead, LSW tries a variety of tactics to confuse the issues.

First, LSW tries to confuse matters by continuing to recite its statistic that 56% of policy files contain conflicting evidence of sales illustration use (see

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1  Substitute Mem. at 5:10) even though that statistic is now discredited because

2  LSW has withdrawn the position on which it was based.  LSW's 56% conflict

3  statistic was based on the contention that a checked box in Part 7 of an application

4  means that no sales illustration was used.  *See* Perla Dec. Concerning Policy

5  Sample (Dkt. 251) at ¶¶8-10.  This 56% statistic was, in turn, recited in the Court's

6  tentative ruling (Sept. 14, 2012) at p. 28.  Plaintiffs pointed out in oral argument

7  and in their Supplemental Submission that a checked box does not in fact mean

8  that no sales illustration was used because the box is supposed to be checked

9  unless a signed illustration of the policy applied for is enclosed with the application

10  and that even small changes in the configuration of the policy prevent an

11  illustration from being of the policy applied for (*e.g.*, a change in the face amount,

12  underwriting class, or amount of planned periodic premium).  Plaintiffs

13  Submission Regarding Identification of Class Members ("Pls. Supp. Br.") (Dkt.

14  339) at 4; Supp. Dinglasan Dec. (Dkt. 339-1) at ¶9 & Exs. F-G.[3]  LSW's

15  Supplemental Memorandum filed on September 25, 2012 falsely asserted that the

16  "policy applied for" means Provider or Paragon rather than the particular

17  configuration of the policy encompassing specifics such as face amount,

18  underwriting class, or planned premium.[4]  LSW's Supplemental Memorandum,

19  filed Sept. 25, 2012, (Dkt. 340) ("LSW's 9/25/12 Mem.") at 6 n.5.  As discussed in

20  Plaintiffs' Motion for Leave to File a Reply to LSW's Substitute Memorandum,

21  LSW's substitute memorandum deleted its position that the "policy applied for"

22

23  _____

24  [3] Plaintiffs' supplemental submission also demonstrated that agents often check the box in Part 7 of the application even when they used an illustration of the policy

25  applied for because they must check that box unless they have obtained a signature on the illustration and have enclosed the illustration with the application.  See

26  Supp. Dinglasan Decl. at ¶9 & Exs. F-J.

27  [4] LSW is wrong in asserting that "prior to the hearing, Plaintiffs' class certification filings did not dispute LSW's assertion that 56% of files have conflicting evidence.

28  This was disputed in the Reply Dinglasan Declaration (Dkt. 294) at ¶10.b.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

referred simply to the type of policy (e.g., Paragon or Provider), apparently because Plaintiffs' Supplemental Memorandum (Dkt. 339), which was filed concurrently with LSW's September 25, 2012 Supplemental Memorandum (Dkt. 340), conclusively debunked this falsehood with evidence from both Ms. MacDonald and an NAIC Q's and A's document from LSW's files. *See* Pls. Supp. Br. (Dkt. 339) at ¶9 & (Dkt. 339-1) Exs. F-G.[5] Thus, although LSW has now abandoned the position upon which its 56% statistic was based, LSW continues to use that statistic in an attempt to confuse the record and the Court. *See* LSW's Sub. Mem. at 5:10.

LSW also tries to confuse matters by claiming that Plaintiffs have revised a previous assertion that "they have found conflicting file evidence only 5% of the time" and "cannot seem to settle on what they think the files show." LSW's Sub. Mem. at 5:18-6:3. In fact, the two earlier Dinglasan declarations never attempted to count the percentage of files that contained conflicting evidence. Rather, they looked at what percentage of files contained one or more documents that indicated the use of a sales illustration. Those declarations asserted that in 68% of the policy files in the Sample one or more documents in the policy files showed the use of a sales illustration. Dinglasan Dec. (Dkt. 229) at 9-C; Dinglasan Reply Dec. (Dkt. 294) at ¶¶4 & 12. This is the same percentage attested to by Ms. Dinglasan in her Supplemental Declaration (Dkt. 339) at ¶3.

Plaintiffs offered no evidence concerning the frequency of conflicting evidence until oral argument on September 18, when Plaintiffs represented that the policy files contained conflicts in fewer than 5% of cases. Plaintiffs' supplemental

---

[5] Additional documents demonstrating that LSW actually interprets the "policy applied for" to mean the particular configuration of the policy encompassing specifics such as face amount, underwriting class, planned premium, and *even the name of the agent* are submitted with the [Proposed] Second Supplemental Declaration of Lesa Dinglasan Reply to LSW's Substitute Supplemental Memorandum ("Proposed SSDLD"), submitted herewith, at Exs. C-E.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

papers document the truth of that assertion even if the concept of a "conflict" is construed broadly.  *See* Supp. Dinglasan Dec. (Dkt. 339-1) at ¶¶3 & 11.  It is LSW that is guilty of shifting positions, as LSW does again in now asserting that it is the signature date on an illustration that is evidence of illustration use rather than the print date.  *See* Part IIIA, *infra*.

Before moving to the specific types of file evidence discussed by LSW, we note that LSW has also attempted to shift the terms of the debate by setting up a straw man:  LSW repeatedly asserts that Plaintiffs contend that various pieces of documentary evidence constitute "conclusive" evidence of sales illustration use. *See* LSW's Sub. Mem. at 5:10-11; 8:8-11; & 10:16-17.  That has never been Plaintiffs' position.  Plaintiffs contend that for most policyholders (66.5% of the Sample to be precise) the policyholder files contain uncontradicted evidence that a sales illustration was used and that such evidence would be sufficient to sustain a given policyholder's burden of proof of class membership.  *See* Supp. Dinglasan Dec. (Dkt. 339-1) at 2:13-14.  No plaintiff would be required to submit "conclusive" evidence of class membership.  LSW is entitled to adduce contrary evidence but has failed to show that it could do so to any extent that could render determinations of class membership unmanageable.

## A. LSW'S NEW POSITION THAT PRINT DATES ARE IRRELEVANT IS INCORRECT.

Although LSW previously treated the print date on an illustration as equivalent to the date of "illustration receipt," it has now apparently abandoned that position and argues instead that only the signature date on an illustration is evidence of the receipt of the illustration and, further, "to the extent the files also contain unsigned illustrations as well, they offer no evidence concerning the timing of use (if any)."  LSW's Sub. Mem. at 6-8 & n.8.  LSW offers no explanation for this about-face.  As Plaintiffs pointed out in the Supplemental Dinglasan Declaration (Dkt. 339) at ¶4, Part III of the Perla Declaration Concerning Policy

Sample (Dkt. 251) purported to analyze the "Relationship Between Application
Date and Illustration Receipt" and treated the print date on an illustration as
equivalent to the date of illustration receipt.  LSW does not deny that this was its
previous position, nor does it explain why it has suddenly concluded that the date
an illustration was printed creates no inference that the illustration was printed in
order to be used at that time.[6]

LSW's position makes no sense for two reasons.  First, this case is about the
use of illustrations in selling policies.  It is not about obtaining signatures on them.
As Plaintiffs previously demonstrated, the record is replete with evidence that
agents use sales illustrations without ever getting them signed or submitting them
to LSW; this includes the use of illustrations that they show to policyholders on a
computer and never print out, and it also includes the use of illustrations that
agents never bother to get signed and therefore do not submit to LSW.  *See*, e.g.,
Pls. Supp. Br. (Dkt. 339) at 3-4 & Supp. Dinglasan Dec. (Dkt. 339-1) at ¶9 & Exs.
F-J.

LSW deals with this by simply sending a batch illustration out with the
policy if no signed illustration has been received previously.  *See* McDonald Dec.
(Dkt. 262) at ¶¶16-17.  And this is precisely why the statistic cited by LSW – the
fact that 434 signed illustrations in the policy files had signature dates that fell after
the print date (Supp. Perla Decl. (Dkt. 346-2) at ¶4) – means nothing.  The great
majority --364 -- of those illustrations have print dates that are *after the issue date
of the policy*; these are necessarily batch illustrations.[7]   [Proposed] SSDLD at ¶2.

---

[6] Although LSW previously submitted evidence concerning the date of the
illustration signature, LSW's analysis was focused on comparing the illustration
signature date to *the date of policy receipt*, *see* Perla Declaration Concerning
Policy Sample (Dkt. 251) at ¶6, not the date of the policy application, which is the
analysis that LSW now submits.  Supp. Perla Decl. (Dkt. 346-2) at ¶¶4-5.

[7] Another statistic cited by LSW – the median time between print date and
signature date – is likewise irrelevant because agents have up to 75 days to deliver

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   Moreover, the fact that a sales illustration might be signed after the print date

2   proves nothing other than that some time passed between when the illustration was

3   printed and when the consumer finally decided to apply for a policy that matched

4   the particular illustration (thus triggering a requirement to sign the illustration and

5   send it to LSW) or, alternatively, that the agent was tardy in complying with the

6   requirement that he obtain and submit a signed sales illustration.[8]

7          Second, the issue is not, as LSW contends, whether an unsigned illustration

8   printed before the application was submitted was used *on the same day it was*

9   *printed*.  Rather, the issue is whether the unsigned illustration was used *before the*

10  *application was submitted*.  All of the unsigned illustrations at issue were

11  submitted by agents for LSW to keep in its files.  LSW advances no reason why an

12  agent would print an illustration during the sales process (i.e., before an application

13  is submitted) and then send it to LSW even though the illustration was never used

14  with the applicant.[9]  LSW had it right the first time – if an illustration was printed

15  during the sales process and was submitted to LSW by the agent, an inference

16  arises that the illustration was used in the sales process (even if not necessarily on

17  the exact day it was printed).  The experience of Mr. Howlett and Ms. Spooner is

18  telling: their sales illustrations were printed on July 27, 2007 and were reviewed

19  and signed on July 30, 2007 in the same meeting during which their applications

20

21

_____

22  the policy and the batch illustration and obtain signatures thereon.  Declaration of

23  Brian P. Brosnahan in Support of Motion for Class Certification, at Dkt. 227-1, Ex. E, BPB 86.

24  [8] The Supplemental Perla Declaration (Dkt. 346-2) is incorrect in asserting that 30

25  sales illustrations bear a signature date after the application.  In fact there are four, which are listed in the Proposed SSLDD at ¶4.

26  [9] LSW asserts without benefit of evidence that "agents do very often print an

27  illustration prior to application, but do not use it until after."  LSW's Sub. Mem. at 7:16-17.  Even if this dubious proposition were true, it would not explain why the

28  agent would submit such an illustration for LSW's files.

_____

were prepared and signed; [10] their agent then submitted the illustrations and the applications to LSW.[11]

## B. THE PRESENCE OF A SIGNED BATCH ILLUSTRATION IN A FILE DOES NOT MEAN THAT NO SALES ILLUSTRATION WAS USED.

LSW tries to confuse matters further by pointing to signed batch illustrations as somehow creating confusion about whether a sales illustration was used.  Thus, LSW points to the fact that Joyce Walker signed a batch illustration.  It is true that Ms. Walker did not recall ever signing the batch illustration, but this is irrelevant to the uncontested fact that she received and relied on a pre-application sales illustration dated October 3, 2007.  *See* Pls. Supp. Br. (Dkt. 339) at 4 & Supp. Dinglasan Decl. (Dkt. 339-1) at ¶9 & Exs. H-J.

LSW falsely asserts that "twice in Plaintiffs' filing they emphasize that it would be improper to look only at Ms. Walker's file given that she cleared up the obvious factual inconsistency in her 'Declaration' and her 'testimony.'"  LSW's Sub. Mem. at 8 n.9, citing Pls. Mem. at 4.  Plaintiffs do not contend that it would be improper to look only at Ms. Walker's file, which contains uncontradicted evidence that she received a sales illustration, nor is there any factual inconsistency between her "declaration" and her "testimony."  Plaintiffs point to Ms. Walker's declaration and testimony solely to expose the disingenuous assertions by LSW that there is some dispute about whether she received a sales illustration.  LSW has produced not a shred of evidence suggesting that Ms. Walker did not receive a sales illustration, and there is no need to look beyond her policy file to see that she

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

---

[10] It makes no difference whether Ms. Spooner provided information for her application before reviewing her illustration, or vice versa, because she reviewed the illustration and prepared her application in the same meeting, and the application was submitted after the meeting was finished.

[11] Howlett Dec. Ex. A (Dkt. 231-1); Spooner Dec. Ex. A (Dkt. 232-1); Shapiro Dec. Ex. J (Dkt. 265) Ex. J; Supp. Dinglasan Dec. Ex. B (Dkt. 339-2); [Proposed] SSDLD Exs.B & F (Spooner Depo. at 231-32).

received a sales illustration.

## C.   LSW IGNORES THE EVIDENCE CONCERNING AGENT'S REPORTS.

While LSW purports to be filing a memorandum that is responsive to Plaintiffs' September 25 submission (Dkt. 339), in fact LSW fails to respond to Plaintiffs' points concerning agents' reports.  For example, LSW asserts that there are 33 instances in which an agent's report lists various materials that were used in the sale, other than an illustration (including a reference to ICS or Quik-Calc), and asserts that this must be taken as affirmative evidence that no illustration was used. LSW's Sub. Mem. at 9 & Supp. Perla Decl. (Dkt. 346-2) at ¶3.  LSW ignores the evidence from its own witness, Victoria McDonald, that "[i]n my experience, however, agents list only a small subset of all the documents that they actually showed or provided to the applicant.  Therefore, it would not be possible, from reviewing the agent report, to get a complete (or even partially complete) sense of all the documentation that was given to applicants."  McDonald Decl. (Dkt. 262) at ¶8.  Although Plaintiffs pointed to this testimony as the reason why Plaintiffs did not count agent's reports that did not state "N/A" or "None" as reports that negated the use of a sales illustration (*see* Supp. Dinglasan Decl. (Dkt. 339-1) at ¶7), LSW fails to respond to this point or discuss Ms. McDonald's testimony.

LSW also fails to note that few of the 33 agent's reports to which it refers create any conflict in the policy files about whether an illustration was used because a large majority of those 33 files did not contain any other evidence of whether a sales illustration was used.  As set forth in the [Proposed] Second Supplemental Declaration of Lesa Dinglasan, submitted herewith, only seven of the policy files that listed materials other than an illustration (or ICS or Quik-Calc) contained other documentary evidence that a sales illustration was used.  In six of those cases, a complete or partial copy of the sales illustration was present in LSW's files; in the seventh case, the box in Part 7 of the application was not

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

checked.  [Proposed] SSDLD at ¶2.  Thus, even if agent's reports that list materials other than an illustration (or ICS or Quik-Calc) are interpreted as stating affirmatively that no sales illustration was used, the total number of conflicts in the policy files is still only 13 out of 400, or 3.25%.  *Id.*

LSW also argues that a reference in an agent's report to "ICS" or "Quik-Calc" does not constitute evidence "that a sales illustration was sent to an applicant."  LSW's Sub. Mem. at 9:18-10:10.  However, LSW fails to address the point made by Plaintiffs in their Supplemental Submission that the Insurance Code requires that any policyholder who was shown a partial illustration on computer, whether in the form of a partial ICS illustration or a Quik-Calc, must be given a complete illustration and that this creates at least an inference or a "strong disputable presumption" that the policyholder also was given a complete copy of the illustration.  *See* Pls. Supp. Br. (Dkt. 339) at 5:10-6:3 (quoting *Hinckley v. Bechtel Corp.*, 41 Cal. App. 3d 206, 212-13 (1974)).

### D. THE APPLICATIONS CREATE FEW, IF ANY, CONFLICTS.

Now that LSW has abandoned its position that a checked box in Part 7 of the application means that no sales illustration was used, LSW mounts only weak arguments concerning applications.  First, it asserts "that if the box in Part 7 is unchecked but no illustration appears in the file, that is a conflict in need of fact-finding."  LSW's Sub. Mem. at 10:20-21.  As Plaintiffs have pointed out, this should not be viewed as a conflict given the deficiencies in LSW's recordkeeping, which LSW itself described as "all over the lot."  *see* September 18, 2012 Hearing Transcript at 35:21-23.  It should thus be no surprise that some files that should contain a signed sales illustration do not in fact contain them.  In any event, there were only 14 such files, and, even if all of these files are counted as conflicts, the policy files still contain conflicting evidence of sales illustration use in less than 5% of the Sample.   Supp. Dinglasan Decl. (Dkt. 339) at ¶11.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

Finally, LSW contends that is "unclear why Plaintiffs believe that an illustration that is expressly not of the policy applied for can serve as the basis for a claim of misrepresentation concerning the different policy that is applied for." LSW's Sub. Mem. at 11:25-26.  LSW's purported lack of clarity on this point is disingenuous.  Plaintiffs pointed out in their motion papers and at oral argument that the language giving rise to all of their deception theories is contained in all illustrations, whether sales illustrations or batch illustrations, that are generated based on the default settings of LSW's software.  Pls. Op. Br. (Dkt. 226) at 2:5-9 & 5:21-6:8; Pls. Reply (Dkt. 250) at 5:14-6:2; Brockett Dec. (Dkt. 228) at ¶¶ 30-38; September 18, 2012 Tr. at 55:3-5.  The fact that a sales illustration may differ from the policy as applied for, or from the policy issued, is irrelevant when all of the illustrations contain the misrepresentations and omissions for which Plaintiffs sue.

This is illustrated in the case of Mr. Howlett, whose sales illustration was based on the assumption that his underwriting class was Elite Non Tobacco. Howlett Decl. (Dkt. 231) Ex. A.  However, LSW's underwriters changed his underwriting class to Standard Non Tobacco, and both his policy and his batch illustration were based on that underwriting class.  *Id.* Ex. B; [Proposed] SSDLD Ex. A.  However, that change has no effect whatsoever on any of Plaintiffs' theories of deception.[12]

## IV.   LSW MISCONSTRUES *YOUNG V. NATIONWIDE MUTUAL INS. CO.*

LSW incorrectly argues that the Sixth Circuit's recent decision in *Young v. Nationwide Mut. Ins. Co.*, 2012 U.S. App. LEXIS 18625 (6th Cir. Sept. 5, 2012) does not apply where the defendant's records are insufficient to identify class members.  To the contrary, the Sixth Circuit in that case affirmed a ruling that the subclass "properly could be certified without the 100% accuracy Defendants

---

[12] Likewise, Plaintiffs' misrepresentations claims are unaffected by differences between Ms. Walker's sales illustration and her batch illustration (e.g., amounts of planned premium and the existence of policy loans).

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

assume to be requisite" and found "persuasive" the district court's reasoning that to allow failures of record management "to defeat class certification would undermine the very purpose of class action remedies." *Id.* at *16.[13]

LSW also does not attempt to dispute or distinguish the district court cases cited by Plaintiffs which, consistent with *Young*, certified class actions against insurance companies and rejected arguments that the incomplete nature of the companies' files was a reason to deny certification. *See, e.g., Chesner v. Stewart Title Guar. Co.*, 2008 U.S. Dist. LEXIS 19303, *35 (N.D. Oh. Jan. 23, 2008). In *Chesner*, as here, the defendant insurer argued that a review of its files would be "inconclusive" in identifying class members. In *Chesner*, as here, the defendant insurer argued that this "colossal endeavor" was a reason to deny certification on manageability grounds. In *Chesner*, the court granted certification and noted that "[m]anageability concerns have been rejected uniformly by courts confronting similar circumstances." *Id.* This Court should do the same here.

## V.   A SIMPLE QUESTIONNAIRE CAN DETERMINE SUBCLASS MEMBERSHIP.

LSW argues that a questionnaire cannot be used to determine membership in the class, but the numerous cases that Plaintiffs have cited demonstrate that such case management techniques are routine. Pls. Supp. Br. (Dkt. 339) at 8-10.  LSW argues that using a questionnaire creates an impermissible opt-in class, but it either misconstrues or misunderstands the concept of an "opt in" class. An "opt in" class is one in which absent class members must take affirmative action to become a member of the class and be bound by the court's decision in the relevant class action. *Kern v. Siemens Corp.*, 393 F.3d 120, 123 (2d Cir. 2004).  Plaintiffs are not

---

[13] LSW falsely accuses Plaintiffs of a "misleading" citation to *Shurland v. Bacci*, 271 F.R.D. 139, 145 (N.D. Ill. 2010). *Shurland* is not based on destruction of records– though plaintiffs alleged that records were not retained, the Court held that, *"[t]he absence of any impropriety aside*, whether a class action is appropriate cannot be a function of [defendant's] record-keeping practices. *Id.* at 145-46.

suggesting an "opt-in" class; if the Court grants certification of the sales illustration subclasses, any individuals who received a sales illustration, if they do not opt out, automatically become members of the subclass and are bound by the Court's judgment, regardless of whether they respond to the questionnaire.

How to determine who is in the subclass is a separate matter.  As noted by Plaintiffs at the hearing, a class member may sustain his burden of proving that he received an illustration through LSW's documents and need not respond to the questionnaire, which underscores that the questionnaire does not create an opt-in class action.  If a person who received a sales illustration does not opt-out, fails to respond to the questionnaire, and cannot sustain his burden to prove class membership by another method such as LSW's documents, he is still bound by the judgment and could not sue LSW on an illustration-based claim.

The authorities cited by LSW are in accord, as they reject attempts to limit class membership to persons who take steps to "opt-in."  *See Kern,* 393 F.3d at 123-127 (reversing certification of class defined as including the heirs and assigns "of all individuals who died in the fire who consent to inclusion," as the class definition "'requires prospective members to take affirmative action' by first consenting 'to be bound by the judgment'"); *Andrews Farms v. Calcot,* 258 F.R.D. 640, 656 (E.D. Cal. 2009).

LSW is wrong to contend that the Court should not use questionnaires because class members might "misremember" whether they received a sales illustration, which is a document that LSW's own executives have testified is uniquely "important" to prospective customers.[14]  Indeed, even the case cited by LSW, *In re Phenylpropanolamine (PPA) Prod. Liab. Litig.,* 214 F.R.D. 614, 619 (W.D. Wash. 2003), accepted the possibility of using sworn affidavits, but held

---

[14] Declaration of Patrick L. Brockett in Support of Motion for Class Certification (Dkt. 228) at ¶28.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

that it was "unrealistic" under the unique circumstances of that case where the lawsuit concerned "minor purchases," any purchase receipts would "not contain enough detail" to determine class membership, and membership turned on the presence of a specific ingredient that was frequently confused by consumers and contained in only certain formulations of products that "differed only slightly in name and packaging." *Id.* at 617-19. Unlike *In re PPA*, where six of the eight class representatives lacked documentary proof and three class representatives testified that they could not remember whether they purchased products containing the ingredient that defined class membership, *see id.* at 618-19, the named Plaintiffs here all possess documentary proof of use of a sales illustration and have presented clear and uncontroverted testimony that they received one prior to their application.

LSW incorrectly contends that class members need to be asked about issues (e.g., One Policy Fee, [15] loans, other disclosures[16]) that do not determine subclass membership. LSW is not entitled to use the questionnaire as a fishing expedition to take absent class member discovery. Pls. Reply at 20 n.109. A questionnaire would simply inquire whether: (1) the policyholder received a sales illustration; (2) whether the policyholder received an Optional Report involving fees; and (3) whether the policyholder had any documentary evidence (e.g., sales illustrations) to submit.[17] These objective questions can assist in the resolution of class

---

[15] Policyholders would not need to be asked about One Policy Fee because the defaults in LSW's software produce those pages as part of the illustration, LSW prohibits agents from using incomplete illustrations, and LSW has provided no evidence that the default settings are ever reversed.

[16] The existence of unspecified "other disclosures" does not bear on class membership – individuals are members of the subclasses if they received a sales illustration.

[17] LSW asserts without evidentiary support that "policyholders simply cannot be expected to remember" illustrations that they were shown on a computer, but it is unreasonable to assume that no policyholder could remember seeing an illustration,

membership where documentary proof is not present in LSW's files.  LSW's contention that such procedural tools are unsuitable is contradicted by the litany of cases Plaintiffs have cited that employ questionnaires or affidavits to resolve more difficult evidentiary questions.

## VI.  LSW IS INCORRECT THAT THE CLASS IS NOT ASCERTAINABLE.

In contending that the subclass is not ascertainable, LSW appears to misunderstand the difference between being able to ascertain an identifiable class and it being administratively feasible for the Court to determine who is a member of the class.  *See*, e.g., *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 209 F.R.D. 323, 336-37 & n.20 (S.D.N.Y. 2002).  Here, there is no realistic dispute that Plaintiffs' subclasses can be ascertained by reference to objective criteria: either an individual received a sales illustration, or he did not.  Plaintiffs' subclass definition provides notice that, if the subclasses are certified, anyone who received a sales illustration is subject to *res judicata* and will be bound.

LSW's argument that it is difficult to determine who received a sales illustration goes, at most, towards the implied requirement that it be administratively feasible to identify whether a particular individual is a member of the subclasses.  But, as Plaintiffs noted in their supplemental submission, "the identity of class members need not be ascertained before class certification," and questions about the manageability of doing so rarely should defeat certification. *See*, e.g., *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 417 (N.D. Ill. 2012); Pls. Sub. Br. at 8.

LSW also cites *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2561, 180

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

---

which is the only document provided to policyholders by LSW that shows how the policy operates.  Nor is it reasonable to think that no policyholder could remember being shown the Optional Report on fees, which is the only information on how much the policy costs.

---

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

(2011), where the Supreme Court reaffirmed that Rule 23 cannot abridge, enlarge, or modify a substantive right.  But, as numerous courts have noted, "the Supreme Court broke no new ground in this observation, and focused in its opinion only on the remarkable procedure proposed by the Ninth Circuit for considering the plaintiffs' claims for backpay," involving the replacement of individualized proof with "Trial by Formula."  *Roderick v. XTO Energy, Inc.*, 281 F.R.D. 477, 487 (D. Kan. 2012); also *Balasanyan v. Nordstrom, Inc.*, 2012 U.S. Dist. LEXIS 74777, *5 (S.D. Cal. May 30, 2012) ("the discussion in Dukes was in a much different context" involving the Ninth Circuit's incorrect belief "that it was possible to replace such proceedings with Trial by Formula where a sample of class members would be deposed, and the percentage of successful claims would then be applied to the class as a whole.").  Here, determinations of class membership would not abridge substantive rights because Plaintiffs propose a "very different" procedure from that trial by formula at issue in *Dukes*, and in this case each member would need to sustain their burden of proving subclass membership.  *E.g, In re Blood Reagents Antitrust Litig.*, 2012 U.S. Dist. LEXIS 118727, *71-72 n.16 (E.D. Pa. Aug. 22, 2012).

    LSW also cites to *Stone v. Advance Am., Cash Advance Ctrs. Inc.*, 278 F.R.D. 562, 571 (S.D. Cal. 2011), but this case is inapposite.  *Stone* involved a unique statute, the California Deferred Deposit Transaction Law ("CDDTL"), which states that "the notice of rights and the written agreement [provided in connection with payday loans] must be 'in the language principally used by the customer.'"  *Id.* at 564.  The court noted that there was no "published or even unpublished case involving a similar situation to the CDDTL," where determination of class membership would depend on an individualized examination of each class members' language skills, including their "unique ability to speak both Spanish and English, and that ability can range from perfect fluency, through a mix of 'Spanglish,' to none."  *Id.* at 570-71.  Unlike *Stone*, where

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   affidavits were proposed to address an inherently individualized subjective

2   interpretation of an individual's "principal" language skills, here the questionnaire

3   would ask straightforward and objective questions regarding whether a subclass

4   member received particular documents from LSW.[18]

5       LSW concedes, *sub silentio*, that no Seventh Amendment issue is presented

6   here, and that due process rights are routinely protected in summary procedures

7   concerning class membership.  Pls. Supp. Br. at 11-13; *see also Ellis v. Costco*

8   *Wholesale Corp.*, 2012 U.S. Dist. LEXIS 137418, *172-78 (N.D. Cal. Sept. 25,

9   2012).  Though LSW's substitute supplemental brief presents issues that will have

10  to be decided in order to determine whether a particular policyholder is a member

11  of the subclasses, it does not provide any evidence that such determinations would

12  be so unmanageable that they present a basis for denying certification of the

13  subclasses.  In fact, many of the issues (*e.g.*, whether it is a conflict in the evidence

14  if an agent's report lists various materials that were used in the sale, other than an

15  illustration) are not individual at all and instead call for a single determination that

16  will be common to the subclass as a whole.

17  Dated: October 5, 2012         KASOWITZ, BENSON, TORRES & FRIEDMAN
                                    LLP
18

19

20
                                    By:   /s/ Brian P. Brosnahan
21

22

23

24

---

25  [18] *Stone's* reference to due process was in the context of record evidence submitted
26  by an employee of the Defendant that the named plaintiff "always spoke English
    and that [the named plaintiff] spoke better English than [Defendant's employee]
27  did."  *Id.* at 565 & 570.  In contrast, LSW submitted no evidence from Plaintiffs'
28  agents, and it is undisputed that the named Plaintiffs received sales illustrations.

---

[PROPOSED] PLAINTIFFS' REPLY TO LSW'S SUBSTITUTE SUPPLEMENTAL MEMORANDUM
Case No. CV 10-9198 JVS (RNBx)