# APPENDIX A

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| BEZALEL CHESNER, et al., | ) | CASE NO.  1:06CV00476 |
| | ) | |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| STEWART TITLE GUARANTY | ) | AND ORDER |
| COMPANY, | ) | |
| | ) | |
| DEFENDANT. | ) | |

This matter is before the Court on a motion for summary judgment and/or class decertification filed by defendant Stewart Title Guaranty Company ("Stewart Title" or "Defendant"). (Doc. No. 73.)

## I. Factual & Procedural Background

Familiarity with the Court's prior opinions in this matter (Doc. Nos. 67 & 77) is assumed. Plaintiffs Bezalel and Lia Chesner ("the Chesners" or "Plaintiffs") purchased a lender's policy of title insurance from Stewart Title in 2003 in connection with a refinance of their home. Approximately three years before refinancing, the Chesners had taken out a mortgage on the same property, at which time they purchased title insurance. Plaintiffs claim that they were overcharged by Stewart Title for the policy purchased in 2003. The premium charge was governed by the Rate Manual filed with the Ohio Department of Insurance by the Ohio Title Insurance Rating Bureau ("OTIRB"), of which Stewart Title is a member. Plaintiffs contend that they were entitled to receive the discounted "reissue rate" set forth in the Rate Manual, but instead improperly were charged the higher "original" rate.

Plaintiffs brought this case as a class action, seeking to represent all similarly-situated purchasers of title insurance from Stewart Title in Ohio on or after January 20, 2000. By order dated January 23, 2008, the Court certified Plaintiffs' claim for breach of implied contract as a class action under Rule 23. (Doc. No. 67.) The Court simultaneously denied certification with respect to Plaintiffs' fraud, breach of fiduciary duty, and unjust enrichment claims. The theory of the case advanced by Plaintiffs in obtaining class certification was that Stewart Title was required to apply the discounted reissue rate whenever the purchaser was eligible to receive it, and that the purchaser's eligibility was required to be determined by whether or not a prior mortgage existed with respect to the refinanced property within the "look-back" period set forth in the Rate Manual. *Chesner v. Stewart Title Guar. Co.*, No. 1:06CV00476, 2008 WL 553773, at *13 (N.D. Ohio Jan. 23, 2008) ("*Chesner I*"). Plaintiffs contend that conformity to applicable law, including insurance regulations such as those in the Rate Manual, is an inferred term of each implied contract, and the failure to charge the discounted rate to eligible purchasers violated the law. *Id.*

At the core of Plaintiffs' theory lies their contention that a prior mortgage in the chain of title during the look-back period necessarily informed Stewart Title that a prior title policy was issued on the property in connection with the previous mortgage. Plaintiffs therefore claim that the mere existence of such prior mortgage triggered Stewart Title's obligation to charge the discounted rate specified in the Rate Manual. According to Plaintiffs, Stewart Title's failure to do so in all such cases constituted a breach of the implied contract between Stewart Title and the purchaser of the policy, resulting in damages to the purchaser represented by the difference between the "original" rate actually charged and the discounted rate Plaintiffs contend should have been charged.

On April 21, 2008, Stewart Title filed a motion for summary judgment and class decertification (Doc. No. 73), asserting that the interpretation of the Rate Manual necessary to sustain Plaintiffs' theory fails as a matter of law and the class should be decertified because individual issues predominate. Plaintiffs responded to the summary judgment motion with a motion for leave to conduct discovery pursuant to Rule 56(f), which the Court denied on July 2, 2008. (Doc. No. 77.) The parties subsequently completed the briefing on Stewart Title's summary judgment motion, and it is now ripe for decision.[1]

## II. Law & Analysis

### A. Standard of Review

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c). The party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The entry of summary judgment is not a disfavored procedural shortcut, but instead is mandated by "the plain language of Rule 56(c) . . . after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party opposing

---

[1] After the briefing was closed, Plaintiffs filed a Motion for Leave to File Attached Response to Defendant's Attack on Integrity of Plaintiffs' Counsel (Doc. No. 80), to which Defendant responded (Doc. No. 81). The Court has

summary judgment may do so with "any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves. *Id*. at 324. The nonmovant must show more than a scintilla of evidence to avoid summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party "must present significant probative evidence in support of its complaint to defeat the motion for summary judgment." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993). In addition, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, "so long as the movant relies upon the absence of an essential element in the pleadings, depositions, or answers to interrogatories. *Black v. Parke*, 4 F.3d 442, 448 (6th Cir. 1993) (citing *Celotex*, 477 U.S. at 324).

In reviewing a motion for summary judgment, the Court must view the evidence in a light most favorable to the nonmoving party and determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determining whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. *Id*. at 252.

---

reviewed and considered the matters discussed in these filings and, therefore, grants Plaintiffs' motion for leave.

**B. Merits**

This case involves (at least nominally) two different provisions of the Rate Manual, PR-9 and PR-10.

**1. Reissue Rate (PR-9)**

PR-9 provides for a discount in certain situations where the prior policy was an owner's policy. In pertinent part, PR-9 states:

> When the owner of land on which application is made for a Loan Policy has had the title to such land insured in said owner by an owner's title insurance policy issued within ten (10) years of the date of the application for a Loan Policy, such owner shall be entitled to a reissue rate of seventy percent (70%) of the rate for original Loan Policy up to the fac[e] amount of such Owner's Policy, provided that that owner-applicant provides a copy of said Owner's Policy or such other information to enable the Insurer to verify the representations made.

(PR-9, Doc. No. 1-2, at 30.)

Stewart Title moves for summary judgment as to Plaintiffs' claims under PR-9, arguing that the plain language of the Rate Manual is inconsistent with Plaintiffs' case theory. Specifically, Stewart Title asserts that the central tenet of Plaintiffs' theory – that the existence of a prior mortgage within the look-back period necessarily indicates the corresponding existence of a title policy – has no possible application to PR-9. This tenet, in turn, is founded upon Plaintiffs' assumption that the lender that issued the prior mortgage required the purchase of a title policy when it issued the mortgage – which, by definition, would have been a lender's policy, not an owner's policy. Because PR-9 only provides for a discount when the prior policy was an owner's policy, Plaintiffs' case theory is inapplicable.

Plaintiffs make no effort to rebut Stewart Title's arguments with respect to PR-9, effectively conceding the point. The Court agrees with Stewart Title that whatever the merits of Plaintiffs' contention that a prior mortgage acts as a proxy for a prior title policy, such

contention, even if it could be proven true, at best would establish the existence of a lender's policy. It does nothing to establish the existence of a prior owner's policy. Moreover, Plaintiffs do not allege that they in fact purchased an owner's policy, nor do they offer to prove that members of the putative class did so. Accordingly, Plaintiffs' case theory fails as it relates to PR-9, and Stewart Title is entitled to summary judgment on that issue. Because there is no genuine issue of material fact and Plaintiff's theory fails as a factual matter, the Court need not address issues relative to the legal interpretation of PR-9, and Stewart Title is entitled to judgment in its favor as a matter of law.

### 2. Refinance Rate (PR-10)

The contested issues in this case focus on PR-10. Plaintiffs claim that when they purchased title insurance from Stewart Title in 2003 in connection with a refinance of their home, Stewart Title should have charged them the discounted rate specified in PR-10 because, approximately three years earlier, they mortgaged the same property and, in doing so, purchased a lender's policy. Plaintiffs make this claim despite their concession that neither they nor anyone else gave Stewart Title or its agent a copy of the earlier policy or information sufficient to enable Stewart Title or its agent to identify such prior policy.[2] To overcome this concession, Plaintiffs contend that when Stewart Title (or its agent) performed a title search on the property in the ordinary course of issuing the policy it necessarily would have uncovered the three-year-old mortgage, which should have alerted Stewart Title (or its agent) to the existence of the lender's policy that accompanied it.

---

[2] According to Stewart Title, the file of its agent, Majestic Title, reflects that its employee asked Mr. Chesner to provide evidence of a prior title policy. It is undisputed that the Chesners did not do so.

PR-10 established a discount formula for sales of title insurance policies in connection with refinance transactions where a prior lender's policy was issued on the same property. It provides:

> When a refinance loan is made to the same borrower on the same land, the following rate will be charged for issuing a policy in connection with the new loan on so much of the amount of the new policy as represents the unpaid principal balance secured by the original loan; provided the Insurer is given a copy of the prior policy, or other information sufficient to enable the Insurer to identify such prior policy upon which reissue is requested, and the amount of the unpaid principal balance secured by the original loan.
>
> | Age of Original Loan Policy | Rates |
> |---|---|
> | 10 years or under | 70% or Original Rate |
> | Over 10 years | 100% of Original Rate |

(PR-10.)

In support of summary judgment, Stewart Title offers several arguments. First, it argues that PR-10 by its plain language applies only to refinance situations (i.e., instances where, by definition, a prior mortgage exists) and, therefore, Plaintiffs' proposed interpretation of PR-10 renders superfluous much of the language regarding proof of prior title insurance, placing Plaintiffs' theory in conflict with principles of statutory interpretation (which counsel an interpretation that gives meaning to all the words). Second, Stewart Title maintains that the unambiguous plain language of PR-10 contradicts Plaintiffs theory because, in order for the discount to apply, Stewart Title must have been given a copy of the prior lender's policy or some other policy-identifying information, and Plaintiffs concede that this did not occur.

Plaintiffs respond that Stewart Title's arguments all depend upon application of statutory interpretation principles, which Plaintiffs contend are inapposite because the Rate Manual is not a statute. Plaintiffs submit that the Rate Manual is appropriately construed using contract principles and, because the Rate Manual is ambiguous, such interpretation presents a

question of fact for a jury to decide. The resultant threshold question is thus whether the Rate Manual should be interpreted like a statute, a contract, or something else.

In Ohio, insurance is a regulated industry, and all insurers are required to file with the superintendent of insurance, inter alia, a schedule of rates they propose to charge. Ohio Rev. Code § 3935.04(A). An insurer may fulfill this requirement by joining a licensed rating bureau which makes such filings on behalf of its members. Ohio Rev. Code § 3935.04(B). Stewart Title joined OTIRB, which filed the Rate Manual on behalf of its membership. The Rate Manual, once approved, established the rates to be charged by title insurers doing business in Ohio, including Stewart Title. Once a rate filing becomes effective, the insurer is prohibited from "mak[ing] or issu[ing] a contract or policy except in accordance with the filings [. . .] in effect for the insurer [. . .]." Ohio Rev. Code § 3935.04(H).

Manifestly, the Rate Manual itself is not, as factual matter, either a statute or a contract. It was filed by OTIRB, a group comprised of private insurance companies, and received the approval of the superintendent of insurance. No authority suggests, however, that such approval constituted the type of legislative action necessary to imbue the Rate Manual with statutory authority. It was not enacted, or even considered, by any legislative body and, therefore, is not a statute. *See* Black's Law Dictionary (8th ed. 2004) (defining "statute" as "[a] law passed by a legislative body; specif., legislation enacted by any lawmaking body, including legislatures, administrative boards, and municipal courts"); *see also* 82 C.J.S. Statutes § 2 ("[a] statute is generally defined as the written will of the legislature, solemnly expressed according to the forms necessary to constitute it the law of the state.")

Recognizing as much, Stewart Title argues instead that the Rate Manual is a "regulation" and, as such, "should be interpreted according to the standards that apply to statutes

and regulations." (Def.'s Reply in Support of Mot. for Summ. J., at 2.) The Court disagrees. The Rate Manual is not a "regulation," as in an "administrative" or "agency" regulation, as the term "regulation" is used by Stewart Title. *See* Black's Law Dictionary (8th ed. 2004) (defining "regulation" as "[a] rule or order, having legal force, usu. issued by an administrative agency"). It was not promulgated by a government entity, as commonly occurs when government agencies set forth, pursuant to statutory authorization, regulations designed to implement the agency's statutory commands. It does not appear in the Ohio Administrative Code, which is the typical province of state regulations. Rather, the Rate Manual was drafted by a private group of title insurers, the OTIRB, and submitted for approval to the Ohio Department of Insurance ("ODI").[3]

Although there is no authority directly on this point, because insurance is a regulated industry in Ohio and the Rate Manual, with the approval of ODI, specifically limits the rates that title insurers, including Stewart Title, may charge for issuing title policies, the Court agrees with Plaintiff that the Rate Manual is akin to a tariff or filed rate and should be interpreted accordingly. In other similarly regulated industries, like shipping and utilities, participating businesses are required to file their rates with the state. In interpreting such filings, Ohio courts have held that the rate filings or "tariffs," once approved by the relevant overseer, "have the force and effect of law."[4] *Barr v. Ohio Edison Co.*, 1995 WL 66351, at *4 (Ohio App. 9th Dist. Feb. 17, 1995) (utility tariff described as having the "force and effect of law"); *Dayton Power &*

---

[3] In addition, Stewart Title's suggestion that Rate Manual be interpreted "according to the standards that apply to statutes and regulations" is utterly unhelpful, given that the two are subject to *different* standards. Nowhere in its briefs does Stewart Title apply regulatory interpretation (which typically involves deference to sponsoring agency's interpretation under *Chevron U.S.A, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)), to the Rate Manual. Moreover, even if the Rate Manual was a "regulation," no regulatory analysis is possible in this case given the complete absence of evidence of an agency's interpretation. And certainly, Stewart Title's own interpretation of the Rate Manual is entitled to no deference; indeed, Stewart Title does not suggest that it is.

[4] Stewart Title agrees with this point, but does so in support of its claim that the Rate Manual should be interpreted as a statute. That the Rate Manual has the force and effect of law does nothing to establish it as a "statute," as opposed to the numerous other legally significant actions having the force and effect of law, such as a validly executed contract.

*Light Co. v. Deagle-Anderson Dev., Inc.*, No. 13602, 1993 WL 333651, at *4 (Ohio App. 2d
Dist. Sept. 1, 1993) (citing *Schmukler v. Ohio-Bell Tel. Co.*, 66 Ohio Law Abs. 213 (Com. Pl.
1953); *Erie R. Co. v. Steinberg*, 94 Ohio St. 189 (1916)). As a result, such rate filings become, in
effect, part of the contract between the parties, such that a violation of the rate filing (e.g.,
levying a charge in excess of the filed rate) would constitute a breach of contract. *See Erie R. Co.
v. Stewart Furnace Co.*, 17 Ohio App. 335, 342 (8th Dist. 1923); *see also Dayton Power &
Light*, 1993 WL 333651, at *4. This conclusion is consistent both with the Ohio Insurance Code,
which prohibits insurers from forming contracts that deviate from their rate filings, *see* Ohio
Rev. Code § 3935.04(H), and with the implied contract cause of action asserted by Plaintiffs,
which assumes compliance with applicable law as an inferred term. Because the Rate Manual
was part of the implied contract between Plaintiffs and Stewart Title, the Court evaluates its
terms according to principles of contract interpretation.[5]

The court's purpose in interpreting a contract is to ascertain and effectuate the
intent of the parties, and it is presumed that the parties' intent is evidenced by the language
employed. *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 313 (1996). When determining the
parties' intent, the contract should be read as a whole. *Foster Wheeler Enviresponse, Inc. v.
Franklin County Convention Facilities Auth.*, 78 Ohio St. 3d 353, 361 (1997). "If a contract is
clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be
determined." *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio, Inc.*, 15 Ohio St.
321, 322 (1984). When a contract contains clear and unambiguous language, the rights and
obligations of the parties are determined based upon the agreement's plain language. *Nationwide*

---

[5] Stewart Title does not argue that an implied contract did not exist between the parties. Additionally, in its reply
memorandum, Stewart Title correctly point out that many, if not all, of the applicable principles for interpreting
contracts and those for interpreting statutes and regulations are the same in this case. (Def.'s Reply in Support of

*Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St. 3d 107, 108 (1995). "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St. 2d 241 (1978). "In the construction of a contract courts should give effect, if possible, to every provision therein contained, and if one construction of a doubtful condition written in a contract would make that condition meaningless, and it is possible to give it another construction that would give it meaning and purpose, then the latter construction must obtain." *Farmers Nat'l Bank v. Delaware Ins. Co.*, 83 Ohio St. 309 (1911).

Where contract language is ambiguous, the meaning of the ambiguous language is a question of fact. *Ohio Historical Soc'y v. Gen. Maint. & Eng'g Co.*, 65 Ohio App. 3d 139, 146 (10th Dist. 1989). A contract is ambiguous if its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations. *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 129 Ohio App. 3d 45, 55 (2d Dist. 1998) (citing *Potti v. Duramed Pharms., Inc.*, 938 F.2d 641, 647 (6th Cir. 1991)). "Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered to give effect to the parties' intentions." *Shifrin v. Forest City Enters., Inc.*, 64 Ohio St. 3d 635, 638 (1992). Any ambiguities in the contract's terms are construed against the drafter. *McKay Mach. Co. v. Rodman*, 11 Ohio St. 2d 77, 80 (1967).

Stewart Title maintains that the pertinent language is unambiguous and, therefore, it is entitled to summary judgment on Plaintiffs' claims under PR-10. Stewart Title contends that

Mot. for Summ. J., at 2-4.)

the ordinary meaning of PR-10's plain language provides for application of the discount only when Stewart Title was, in fact, given (1) a copy of the prior policy, or (2) other information enabling it to identify the prior policy. According to Stewart Title, although the phrase "other information" is not defined expressly, its meaning is nevertheless limited by the language requiring that it allow the insurer to identify the prior title policy.

Plaintiffs respond by arguing that the phrases "is given" and "other information" are ambiguous because PR-10 does not define who is supposed to give the information or what information would suffice. From this premise, Plaintiffs assert that the ambiguity in the Rate Manual creates a question of fact for determination by a jury. For instance, Plaintiffs take the position that the alleged ambiguity in the phrase "other information" can only be resolved by resort to extrinsic evidence including evidence of Stewart Title's course of dealing with purchasers of title insurance as well as its various agents that sell its policies to the public.

Plaintiffs concede that they did not give Stewart Title or its agent an actual copy of their prior policy. There is, therefore, no genuine issue of material fact as to Plaintiffs' ability to support their theory by offering such proof. Thus, the contested portion of PR-10 truly at issue provides for application of the discounted refinance rate when "the Insurer is given [. . .] other information sufficient to enable the Insurer to identify [the] prior policy upon which reissue is requested [. . .]." However, before the Court resolves this issue, the Court will first address whether this action can proceed under Rule 23 based upon the theory proffered by Plaintiffs in support of class certification.[6] The Court concludes that it cannot, and the class must be decertified.

---

[6] In light of the disposition of the motion, the Court expressly declines to decide at this time whether the Rate Manual is ambiguous as a matter of law and, if so, what term or terms contain ambiguity. For purposes of the instant motion as it pertains to the issue of decertification, the Court assumes the existence of the ambiguities identified by

What Plaintiffs have identified as their theory of liability and have offered to prove is that the "other information" received by Stewart Title in the course of their transaction with the Chesners is the title report that Stewart Title orders or prepares as a perfunctory matter in all such transactions.[7] The information in the title report that Plaintiffs contend "would enable the Insurer to identify [the] prior policy" is the existence of a prior mortgage in the look-back period. There is no question that a title report (or some similar document) would, in fact, reveal to Stewart Title whether a prior mortgage was issued on the property and, if so, whether it occurred during the look-back period.[8] Thus, the pertinent question becomes whether the existence of a prior mortgage would enable Stewart Title to identify the prior policy. Unfortunately for Plaintiffs, the answer is, at best, maybe.

In any given case where Stewart Title was alerted to the existence of a prior mortgage in the look-back period, it could then make further inquiry to determine whether the prior mortgage was accompanied by a lender's policy. But there is no dispute that, as a matter of fact, not all prior mortgages were accompanied by a lender's policy.[9] (*See* Def.'s Ex. 4, Harley Dep. at 68-69, 111-112; Ex. 2, O'Brien Dep. at 31, Ex. 2.) Even when construed most liberally in Plaintiffs' favor, the language of the Rate Manual simply cannot be read to exclude the

---

Plaintiffs and construes those terms in the light most favorable to Plaintiffs' interpretation.

[7] For purposes of Plaintiffs' theory and the instant motion, the "other information" does not necessarily have to be a title report, but could be anything that would inform Stewart Title or its agent of the existence of a prior mortgage in the chain of title during the look-back period.

[8] Plaintiffs do not necessarily even offer to prove that Stewart Title actually ran a title search in every case, only that doing so was a routine practice and, if it was done, it would show whether or not a prior mortgage existed within the look-back period. For purposes of this motion, the Court assumes the truth of this contention without making any determination as to its merits as a matter of fact.

[9] Plaintiffs cite the deposition of William Zabkar (Doc. No. 41-9) in arguing that Stewart Title's suggestion that there are "regional variations" throughout Ohio concerning the purchase of a lender's policy of title insurance in connection with residential mortgages is a disputed issue of fact. (*See* Pl.'s Opp'n to Mot. for Summ. J. at 21-22.) This may very well be, but it is beside the point. While there may be a genuine dispute as to whether such regional variations exist, there is no question that not all mortgages issued in Ohio are accompanied by a lender's policy. Indeed, Zabkar's deposition is consistent with all the other evidence on this point, as he indicated that several lenders do not require title insurance in connection with a purchase money mortgage. (Zabkar Dep., 38:20 – 39:13.)

requirement of an actual prior policy and substitute in its stead (as Plaintiffs would have it) the mere existence of a prior mortgage. Pursuant to the language of the Rate Manual, even with the purported ambiguities construed in Plaintiffs' favor, the "other information" is inextricably tethered to the requirement that it "enable the Insurer to identify [the] prior policy[.]"[10] Thus, whatever forms the "other information" might take, it must lead eventually to an actual prior title policy.[11]

This conclusion directly conflicts with Plaintiffs' insistence during the class certification phase that proof of a prior mortgage (rather than proof of an actual prior policy) was sufficient to trigger application of the discount. The Court's class certification order made clear that its conclusion that the requirements of Rule 23(b)(3) were satisfied rested heavily upon this representation and that, if this representation later proved untenable, the class would be decertified.[12] Even when viewing the language of the Rate Manual most favorably to Plaintiffs, proof of a prior mortgage cannot establish entitlement to the discount; rather, the evidence of the

---

[10] Reading the Rate Manual as Plaintiffs propose would be tantamount to deleting the phrase "enable the Insurer to identify [the] prior policy[.]" Since a reading is available that gives meaning to this provision, under applicable principles of contract law, Plaintiffs' proposal must be rejected. Moreover, construing the Rate Manual in the manner Plaintiffs' suggest would not only void the language concerning identification of the prior policy, it would render all of PR-10 effectively meaningless. Without the requirement that the other information enable the insurer to identify the prior policy, the discount would apply where the insurer was given either a copy of the prior policy or "other information." Without this limitation, the phrase "other information" could mean anything at all – e.g., information having nothing at all to do with title insurance. Such an interpretation would be absurd and unsustainable as a matter of contract law.

[11] Plaintiffs correctly note that PR-10 does not require that the insurer was given conclusive evidence of the prior policy, only that it was given "other information." (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 21.) However, Plaintiffs view the phrase "other information" in isolation, neglecting to mention the function PR-10 requires such "other information" to serve, namely, to allow the insurer to identify the prior policy. Whatever constitutes "other information," in light of the language of PR-10, it must "enable the Insurer to identify [the] prior policy [. . .]" (regardless of whether the insurer actually chose to do so). Accordingly, it is tautological that a prior policy is in fact required; no amount of "other information" could allow an insurer to identify the prior policy if it never existed.

[12] *See Chesner I*, 2008 WL 553773, at *13 ("Plaintiffs' theory regarding breach is that the discounted rates must be applied whenever the purchaser is eligible, that eligibility turns on the existence of a prior mortgage in the look-back period, and therefore failure to charge the discounted rate violates applicable law. If that is correct, circumstantial evidence would be of no assistance to the court. Likewise, if any part of the theory is incorrect, then Plaintiff[s] would be unable to establish breach of implied contract on a class-wide basis, and the individual factual circumstances of the transactions similarly would be irrelevant. Thus, the Court finds class certification of the Plaintiffs' implied contract [claim] is appropriate, limited to the legal theory as defined by Plaintiffs and described

actual prior policy must be provided. There is simply no question that Plaintiffs cannot provide class-wide proof establishing that every class member purchased a prior lender's policy. To do so, every individual file must be examined in detail. This, again, is contrary to Plaintiff's prior representation, which, in turn, formed the basis for the Court's previous decision to certify the class.

Unable to decouple the "other information" from the requirement that it "enable the Insurer to identify [the] prior policy[,]" Plaintiffs attempt to circumvent it altogether by arguing a version of waiver. Plaintiffs contend that the evidence establishes that Stewart Title granted discounts under PR-10 under circumstances where it had information indicating a prior mortgage in the look-back period and nothing more (and perhaps not even that much). Accordingly, Plaintiffs contend that by failing to insist in some cases upon production of information identifying the actual prior policy, Stewart Title made its own judgment that the prior mortgage was a sufficient proxy for the prior policy and thereby waived its right to rely on the language of the Rate Manual in all cases.

A waiver is a voluntary relinquishment of a known right, with the intent to do so with full knowledge of the facts. *City of N. Olmsted v. Eliza Jennings, Inc.*, 91 Ohio App. 3d 173, 180 (8th Dist. 1993) (citing *Kiefer Mach. Co. v. Henry Niemes, Inc.*, 82 Ohio App. 310, 315 (1st Dist. 1948)). Equivocal or inconsistent conduct does not constitute waiver, *id.*; *State ex rel. Webb v. Brian City Sch. Dist. Bd. of Educ.*, 10 Ohio St. 3d 27, 33 (1984), nor does mere silence where one is under no obligation to speak. *State ex rel. Madden v. Windham Exempted Village Sch. Dist. Bd. of Educ.*, 42 Ohio St. 3d 86, 89 (1989) (citing *Allenbaugh v. City of Canton*, 137 Ohio St. 128 (1940); *List & Son Co. v. Chase*, 80 Ohio St. 42 (1909)). A waiver is established only by

supra.")

proof that the waiving party intentionally acted in a manner inconsistent with claiming the right, and those actions misled the other party to his prejudice, thereby estopping the party having the right from insisting upon it. *Mark-It-Place Foods, Inc. v. New Plan Excel Realty Trust*, 156 Ohio App. 3d 65, 92-93 (4th Dist. 2004) (citing *Motz v. Root*, 53 Ohio App. 375, 376-77 (1934)).[13]

There is no allegation that Stewart Title acted inconsistently in its specific dealings with the Chesners. Rather, Plaintiffs claim that Stewart Title acted inconsistently by granting the discount to other customers under circumstances where it did not insist on presentation of either the prior title policy or other information verifying the policy's existence, and therefore waived its right to insist that the Chesners produce such information. Plaintiffs have not, however, provided any authority for this position,[14] and the Court's research did not reveal any. Indeed, the relevant cases indicate that the waiver analysis is performed on an individualized, case-by-case basis. *See, e.g., Bhole, Inc. v. D&A Plumbing & Heating, Inc.*, 2007 WL 2050318, at *3 (Ohio App. 5th Dist. July 16, 2007) (citing *Wishnoskey v. Star-Lite Bldg. & Dev. Co.*, No. 77245, 2000 WL 1281830, at *3 (Ohio App. 8th Dist. Sept. 7, 2000) ("A court's determination whether a party has waived its right to arbitration depends upon the facts and circumstances of the case [. . .].") Therefore, a waiver of a contract term by a party with respect to a specific counterparty has no effect on that party's ability to enforce the same term in a separate contract with a different and unrelated counterparty. *See ISI Sys., Inc. v. Equifax, Inc.*,

---

[13] This type of waiver is known as "waiver by estoppel." *See, e.g., Cooper Tire & Rubber Co. v. Warner Mech. Corp.*, No. 5-06-39, 2007 WL 881499, at *3 (Ohio App. 3d Dist. Mar. 26, 2007) (citations omitted).

[14] The only authority cited by Plaintiffs that even arguably touches on this point is *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 164 (1922). *Keogh* is inapposite, largely because it involved antitrust claims under federal law, while the instant case concerns implied contract claims under Ohio state law. Additionally, Stewart Title is not asserting the filed tariff doctrine (initially established in *Keogh*) as a defense to Plaintiffs' claims. As explained herein, Plaintiffs fail to offer any support for the proposition that, with respect to implied contract claims under Ohio law, actions by Stewart Title in connection with other implied contractual dealings with absent third-parties bar Stewart Title from asserting its contractual rights in its dealings with members of the class. Certainly, under its particular facts and circumstances, the statement in *Keogh* that "[t]o be legal a rate must be nondiscriminatory," does nothing to advance this specific proposition.

No. 93-12186-MEL, 1996 WL 33718, at *6 (D. Mass. Jan. 12, 1996) (failure to insist upon adequate notice of claim under indemnification agreement as to claim by unrelated third party did not waive notice as to claim by plaintiff under same agreement).[15] The class claim asserted by Plaintiffs is based upon an implied contract theory, pursuant to which Plaintiffs contend that Stewart Title formed a separate implied contract with every purchaser of title insurance, with each contract incorporating the terms of the Rate Manual, including PR-10. Stewart Title's actions concerning PR-10 vis-à-vis non-party[16] contractual counterparties is simply not relevant to whether Stewart Title waived its right to enforce PR-10 in its dealings with Plaintiffs or any of the unnamed class members.

Moreover, even if this information is relevant, it cannot establish waiver by Stewart Title with respect to the entire plaintiff class. "[A] party who has waived its right to enforce a contract term can revoke the waiver unless the revocation will prejudice the opposing party. *Cleveland Thermal Energy Corp. v. Cleveland Elec. Illuminating Co.*, No. 80312, 2002 WL 1767400, at *6 (Ohio App. 8th Dist. Aug. 1, 2002). The party seeking to enforce the waiver must show that failure to do so will result in prejudice to him, *Andrews v. Ohio State Teachers Retirement Sys. Bd.*, 62 Ohio St. 2d 202, 205 (1980) (citing *White Co. v. Canton Transp. Co.*,

---

[15] Plaintiffs seem to assert that *Randleman v. Fidelity Nat'l Title Ins. Co.*, 465 F. Supp. 2d 812, 820 (N.D. Ohio 2006) is to the contrary, but the Court is not persuaded. First, the statement Plaintiffs cite ("it is at least arguable that the defendant waived any right, as may have been provided to it under the [Rate Manual], to confirmation that a prior policy had issued") is itself equivocal and inconclusive. Second, it is dicta (since the court in *Randleman* was deciding a Rule 12(b)(6) motion and already had concluded that the complaint stated a viable implied contract claim (a conclusion with which this Court agrees) and therefore had no occasion to determine the merits of the waiver theory). *See id.* at 818-19. (Indeed, the court in *Randleman* never actually reached a conclusion as to the waiver theory, but merely labeled it "arguable.") Third, and most importantly, the dicta from *Randleman* is not supported by any authority at all, as the decision makes no mention of the legal requirements for establishing waiver. *Randleman* simply does not support the proposition that Stewart Title waived PR-10 by way of actions not involving the class members in this case and of which they were not aware, nor does it help Plaintiffs establish such a waiver on a class-wide basis without showing the individual elements of a waiver as to each individual. To the extent it does, it is not persuasive.

[16] Those counterparties that received the benefit of Stewart Title's failure to insist upon compliance with PR-10, and thus received the discounted price, are excluded from the class by definition, as the class involves claims by those

---

131 Ohio St. 190 (1936)), which he may do by showing that he changed his position in reliance upon the waiver. *Chubb v. Ohio Bureau of Workers' Comp.*, 81 Ohio St. 3d 275, 279 (1998).

Assuming that Stewart Title's actions in granting discounts under PR-10 to some non-party individuals constituted a waiver relevant to the implied contracts involving Plaintiffs and the unnamed class members, Plaintiffs have no way of showing on a class-wide basis that they knew about such waiver, the determination of which is, of course, specific to each individual class member. Likewise, even if Plaintiffs could show class-wide knowledge of other waivers of the provisions of PR-10 by Stewart Title, they would also have to show reliance, and that determination also is particular to each and every individual. Thus, in order to show prejudice, and in turn, a valid waiver, Plaintiffs necessarily would have to conduct detailed factual inquiries into the circumstances of each and every transaction between the class members and Stewart Title. With respect to Plaintiffs' waiver argument, such inquiries would have to involve depositions of multiple individuals (at a minimum, the purchaser and the Stewart Title agent that sold the policy) relative to each individual claim. This is contrary to Plaintiffs' representations in support of class certification (which convinced the Court that no such individualized inquiries would be required) and, concomitantly, to findings in the Court's class certification order specifically relying upon such representations. *See Chesner I*, 2008 WL 553773, at *16 (finding that "Plaintiffs' liability theory eliminates the need for individualized inquiry into the communications that did or did not take place between the Agency Sellers and the individual class members. Under this theory, liability is susceptible to determination based on objective factors. Whatever information is needed regarding individual transactions should be

---

individuals that did not receive the discount.

ascertainable from documentary records, without need for deposition testimony from participants in the transaction.")

As a result of the foregoing analysis, it is clear that if permitted to continue as a class action, the case necessarily would devolve into a claim-by-claim factual inquiry merely to establish liability, with the parties being forced to examine every single claim file[17] to determine (at a minimum) (a) whether or not a prior mortgage during the look-back period was associated with an actual lender's policy of title insurance (and thus whether, assuming interpretation of the phrases "is given" and "other information" most favorable to Plaintiffs, the requirements of PR-10 could have been met) and/or (b) whether individual claimants were somehow aware that Stewart Title waived PR-10 in other instances and relied to their detriment on that knowledge (justifying a finding that Stewart Title waived the implied contractual terms supplied by PR-10 in individual cases involving Plaintiffs and the unnamed class members).[18] To permit the case to proceed in this fashion would contravene the Court's class certification order, the principles of Rule 23, and governing case law.[19]

Pursuant to Rule 23(c)(1)(C), "[a]n order that grants [. . .] class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). After a class is certified, the court has a continuing duty to ensure that the requirements of Rule 23 remain satisfied as the case progresses. *Bradberry v. John Hancock Mut. Life Ins. Co.*, 222 F.R.D. 568,

---

[17] As Plaintiffs made clear during class certification, there are tens, if not hundreds of thousands of these. *Chesner I*, 2008 WL 553773, at *5 (discussing numerosity requirement).

[18] By, for example, foregoing the opportunity to present a copy of their prior title policy or other information because they assumed Stewart Title automatically would apply the discount when it discovered the existence of a prior mortgage through its own efforts.

[19] This conclusion is in conflict with a similar decision in *Randleman*, 251 F.R.D. 267, 279 (N.D. Ohio 2008) ("*Randleman II*") where the district court found that the issue of waiver was a common question supporting a finding of predominance. For the reasons previously explained more fully – specifically, that waiver under Ohio law can only be assessed by focusing on the facts as they relate to the parties to each individual transaction – the Court disagrees with this assessment in *Randleman II*.

571 (W.D. Tenn. 2004) (citations omitted). "Where [. . .] no one set of operative facts establishes liability, no single proximate cause equally applies to each class member, and individual issues outnumber common issues, decertification of the class is required." *Ilhardt v. A.O. Smith Corp.*, 168 F.R.D. 613, 620 (S.D. Ohio 1996) (citing *In re Am. Med. Sys.*, 75 F.3d 1069, 1085-86 (6th Cir. 1996)).

As discussed in *Chesner I*, the Court previously accepted Plaintiffs' arguments in support of certification of the implied contract claim because Plaintiff insisted that the liability determination could be made on a class-wide basis without inquiry into the particulars of every individual transaction. With the case now before the Court on Defendant's motion for summary judgment, the Court finds that under the applicable law, viewing the facts most favorably to Plaintiffs, that is not the case. Liability turns on questions that can only be answered by examining the specific facts of every individual claim. This means, in turn, that the Court's earlier conclusions regarding the predominance prong of Rule 23(b)(3) are no longer sound. Based upon the foregoing discussion, the Court finds that individual issues predominate over common ones, and that the case would be unmanageable if administered as a class action. Rule 23(b)(3)'s predominance requirement is therefore no longer satisfied. Accordingly, the Court finds the action unsuitable for class treatment and hereby decertifies the class. *See, e.g., In re LifeUSA Holding Inc.*, 242 F.3d 136, 148 (3d Cir. 2001) (reversing district court certification order because class did not meet the predominance, superiority, and manageability requirements of Rule 23(b)(3)).

With the class decertified, this action shall proceed with respect to the remaining claims of the named Plaintiffs only.[20] Because not all of Plaintiffs' separate claims have been

---

[20] This case was removed to federal court by Defendant and jurisdiction in this Court is supplied by CAFA, 28

fully addressed by the parties, the Court has elected to decline ruling on any of them in this order. If the parties wish to file additional dispositive motions regarding these claims, the Court will permit them to do so, thereby allowing each of the remaining claims to be addressed more fully.

### III. Conclusion

For the foregoing reasons, Plaintiffs have failed to establish a genuine issue of material fact as to their claims under PR-9. Accordingly, Stewart Title's motion for summary judgment is granted insofar as it relates to PR-9. As to Plaintiffs' claims under PR-10, the Court finds them unsuitable for treatment as a class action and hereby decertifies the class. Stewart Title's motion for summary judgment as to Plaintiffs' individual claims under PR-10 is denied, without prejudice. Having decertified the single class claim, the Court will set a telephonic status conference with counsel by separate order to determine whether notice of the decertification is required to be sent to all putative class members pursuant to Rule 23(e) and, if so, the content of such notice. *See Doe v. Lexington-Fayette Urban County Gov't*, 407 F.3d 755, 764 (6th Cir. 2005) (citing *Culver v. City of Milwaukee*, 277 F.3d 908 (7th Cir. 2002)).

**IT IS SO ORDERED**.

Dated: January 9, 2009

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

U.S.C. § 1332(d)(2). While the few cases discussing the effect of post-removal certification or decertification decisions on continuing federal jurisdiction under CAFA are split, *see Good v. Ameriprise Fin., Inc.*, 248 F.R.D. 560, 574-75 (D. Minn. 2008) (collecting cases), the Court finds persuasive those holding that jurisdiction is continuing and post-removal developments do not alter the Court's CAFA jurisdiction. *See Colomar v. Mercy Hosp., Inc.*, No. 05-22409, 2007 WL 2083562, at *2-3 (S.D. Fla. July 20, 2007). These courts reason that the well-established "time of removal" principle that dictates the amount in controversy for purposes of the general diversity statute also applies to cases under CAFA. *See, e.g., Levitt v. Fax.com*, No. WMN-05-949, 2007 WL 3169078, at *7 (D. Md. May 25, 2007) (citing *Davis v. Homecomings Fin.*, No. C05-1466RSL, 2007 WL 905939, at *1-2 (W.D. Wash. Mar. 22, 2007)).